**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROBERT PURRINGTON, Individually and on Behalf of All Others Similarly Situated, | **Case No.** |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| LAKELAND INDUSTRIES, INC., JAMES M. JENKINS, CHARLES D. ROBERSON, and ROGER D. SHANNON, | |
| Defendants. | |

Plaintiff Robert Purrington ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Lakeland Industries, Inc. ("Lakeland" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Lakeland securities

between December 1, 2023 and December 9, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     Lakeland, together with its subsidiaries, manufactures and sells industrial protective clothing and accessories for the industrial and public protective clothing market worldwide. The Company employs a so-called "small, strategic, and quick" ("SSQ") mergers and acquisitions ("M&A") strategy to purportedly drive its growth in revenue and profitability.

3.     At the end of November 2023, Lakeland announced its acquisition of New Zealand-based Pacific Helmets NZ Limited ("Pacific Helmets"), a purported leading designer and manufacturer of helmets for the firefighting, wildland firefighting, and rescue markets. Defendants touted Pacific Helmets' purported "premium solutions" and said that the Company's acquisition of it enhanced Lakeland's product portfolio.

4.     In February 2024, Lakeland announced its acquisition of the related companies Jolly Scarpe S.p.A. (based in Italy) and Jolly Scarpe Romania S.R.L. (collectively, "Jolly"), a purported leading designer and manufacturer of professional footwear for the firefighting, military, police, and rescue markets. Defendants touted this acquisition as another significant milestone in Lakeland's expansion efforts, as well as Jolly's purported strong brand with a well-established reputation for quality and innovative design and manufacturing.

5.     At all relevant times, Defendants represented that Lakeland would realize significant benefits from the foregoing acquisitions in both the near and long term, while touting the Company's overall SSQ M&A strategy. Moreover, following the onset of tariff-related market

uncertainties in 2025, Defendants consistently represented that the Company was well positioned to weather tariff-related headwinds while continuing to pursue its SSQ M&A strategy. Indeed, throughout the Class Period, notwithstanding tariff-related headwinds, Defendants made repeated assurances regarding their visibility into Lakeland's future performance in upcoming quarters, consistently expressing confidence in their financial guidance issued to investors.

6.     For example, in July 2024, Defendants represented that, for Lakeland's fiscal year ("FY") 2025,[1] they expected, *inter alia*, adjusted EBITDA,[2] excluding any material negative impact from foreign exchange ("FX"), to be in the range of $18 million to $21.5 million, and repeatedly reaffirmed that they expected the Company to achieve adjusted EBITDA of at least $18 million in FY 2025 thereafter.

7.     Similarly, in April 2025, Defendants represented that, for Lakeland's FY 2026, they expected revenue of $210 to $220 million and adjusted EBITDA, excluding any material negative impact from FX, of $24 to $29 million. Defendants indicated that, notwithstanding tariff-related uncertainties, they had visibility into Lakeland's future performance by virtue of various purported positive market signals they observed and their widely touted tariff mitigation measures.

8.     Throughout the Class Period, Defendants made materially false and misleading statements regarding Lakeland's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Lakeland was experiencing significant, sustained issues with its Pacific Helmets and Jolly businesses, including, *inter alia*, shipping-related delays, production issues, and slower than expected rollout of new products; (ii) accordingly, Defendants overstated the anticipated and actual positive impact of

---

[1] Lakeland's FY ends on January 31.

[2] "EBITDA" refers to earnings before interest, taxes, depreciation, and amortization.

these businesses on Lakeland's financial results, as well as the overall strength and quality of Pacific Helmets' and Jolly's respective operations; (iii) Lakeland's business and financial results were significantly deteriorating because of, *inter alia*, tariff-related headwinds and timing, certification delays, and material flow issues in its acquired businesses; (iv) accordingly, Defendants overstated the strength of their tariff mitigation measures and SSQ M&A strategy; (v) as a result of all the foregoing issues, Defendants' financial guidance was unreliable; and (vi) as a result, Defendants' public statements were materially false and misleading at all relevant times.

9.    The truth began to emerge on September 4, 2024, when, during post-market hours, Lakeland issued a press release reporting its financial results for the second quarter ("Q2") of its FY 2025.  Among other results, Lakeland reported revenue of $38.51 million for the quarter, missing consensus estimates by $1.39 million.  Defendant James M. Jenkins ("Jenkins"), the Company's President, Chief Executive Officer ("CEO"), and Executive Chairman, revealed "the shortfall was due to shipment timing," and that, *inter alia*, Jolly had "substantial fire orders delayed to the late third and early fourth quarter."

10.    On this news, Lakeland's stock price fell $1.86 per share, or 7.82%, to close at $21.92 per share on September 5, 2024.

11.    On April 9, 2025, during post-market hours, Lakeland issued a press release reporting its financial results for its fourth quarter ("Q4") and FY of 2025.  Among other results, Lakeland reported Q4 GAAP[3] earnings per share ("EPS") of -$2.42, missing consensus estimates by $2.80, and FY 2025 adjusted EBITDA, excluding FX losses, of only $17.4 million—**significantly below Defendants' repeatedly reiterated guidance of EBITDA of at least $18 million**.  Defendant Jenkins blamed these disappointing results on, *inter alia*, "a large Jolly fire

---

[3] "GAAP" refers to generally accepted accounting principles.

boots order that was initially expected to ship in Q2 of FY25 [that] has now slipped into FY26," "weakness . . . at Pacific Helmets resulting from production issues and product offering updates[,]" and "slower than expected" "rollout of new products from Pacific Helmets and Jolly Boots[.]"

12.    On this news, Lakeland's stock price fell $2.63 per share, or 14.33%, to close at $15.72 per share on April 10, 2025.

13.    Then, on June 9, 2025, during post-market hours, Lakeland issued a press release reporting its financial results for the first quarter ("Q1") of its FY 2026.  Among other results, Lakeland reported Q1 GAAP EPS of -$0.41, missing consensus estimates by $0.60, as well as revenue of $46.74 million, missing consensus estimates by $2.1 million.  Defendant Jenkins blamed these disappointing results on, *inter alia*, its Pacific Helmets business "resulting from production issues and updates to product offerings[,]" as well as "shipment timing" and "tariff-related delays[.]"  Defendant Roger D. Shannon ("Shannon"), Lakeland's Chief Financial Officer ("CFO"), attributed the shortfall in adjusted EBITDA in the quarter to, *inter alia*, "elevated freight costs resulting from tariff-related inventory build, and dilution from acquisitions."

14.    On this news, Lakeland's stock price fell $4.29 per share, or 22.16%, to close at $15.07 per share on June 10, 2025.

15.    On September 9, 2025, during post-market hours, Lakeland issued a press release reporting its financial results for Q2 of its FY 2026.  Among other results, Lakeland reported revenue of $52.5 million for the quarter, missing consensus estimates by $2.09 million.  Defendant Jenkins once again blamed these disappointing results on, *inter alia*, "Pacific Helmets resulting from updates to product offerings and production issues[,]" as well as "continued delays in purchasing decisions due to tariff uncertainty[.]"

16.    On this news, Lakeland's stock price fell $0.64 per share, or 4.43%, to close at $13.80 per share on September 10, 2025.

17.    Then, on December 9, 2025, during post-market hours, Lakeland issued a press release reporting its financial results for the third quarter ("Q3") of its FY 2026.  Among other results, Lakeland reported Q3 2026 GAAP EPS of -$1.64, missing consensus estimates by $1.93, and revenue of $47.6 million, missing consensus estimates by $9.05 million, blaming, *inter alia*, "timing, certification delays, and material flow issues" in its acquired businesses, as well as tariff-related headwinds.  The press release further revealed that Lakeland was withdrawing its previously issued financial guidance for FY 2026 and would not provide financial guidance going forward because the foregoing "challenges have affected our forecasting ability[.]"

18.    The same day, also during post-market hours, Lakeland filed a current report on Form 8-K with the SEC, disclosing that Defendant Shannon's employment had been terminated.

19.    Following these disclosures, Lakeland's stock price fell $5.85 per share, or 38.97%, to close at $9.16 per share on December 10, 2025.

20.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

21.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

22.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

23.    Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Lakeland's common stock trades on the Nasdaq Stock Market ("NASDAQ"), which is located in this District.

24.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

25.    Plaintiff, as set forth in the attached Certification, acquired Lakeland securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

26.    Defendant Lakeland is a Delaware corporation with principal executive offices located at 1525 Perimeter Parkway, Suite 325, Huntsville, Alabama 35806.  The Company's common stock trades in an efficient market on the NASDAQ under the ticker symbol "LAKE".

27.    Defendant Jenkins has served as Lakeland's President and CEO since June 1, 2024, before which he had served as the Company's Acting President and CEO since February 1, 2024. Defendant Jenkins has also served as Lakeland's Executive Chairman at all relevant times.

28.    Defendant Charles D. Roberson ("Roberson") served as Lakeland's CEO from before the start of the Class Period to January 31, 2024.

29.    Defendant Shannon served as Lakeland's CFO at all relevant times.

30.    Defendants Jenkins, Roberson, and Shannon are collectively referred to herein as the "Individual Defendants".

31.     The Individual Defendants possessed the power and authority to control the contents of Lakeland's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Lakeland's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Lakeland, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

32.     Lakeland and the Individual Defendants are collectively referred to herein as "Defendants".

## SUBSTANTIVE ALLEGATIONS

### Background

33.     Lakeland, together with its subsidiaries, manufactures and sells industrial protective clothing and accessories for the industrial and public protective clothing market worldwide. The Company employs a so-called SSQ M&A strategy to purportedly drive its growth in revenue and profitability.

34.     At all relevant times, Defendants represented that Lakeland would realize significant benefits from its acquisitions of Pacific Helmets and Jolly in both the near and long term, while touting the Company's overall SSQ M&A strategy. Moreover, following the onset of tariff-related market uncertainties in 2025, Defendants consistently represented that the Company was well positioned to weather tariff-related headwinds while continuing to pursue its SSQ M&A

strategy. Indeed, throughout the Class Period, notwithstanding tariff-related headwinds, Defendants made repeated assurances regarding their visibility into Lakeland's future performance in upcoming quarters, consistently expressing confidence in their financial guidance issued to investors.

**Materially False and Misleading Statements Issued During the Class Period**

35.    The Class Period begins on December 1, 2023, the day after Lakeland issued a press release during post-market hours announcing its acquisition of Pacific Helmets. The press release touted Pacific Helmets' purported "differentiated product offerings through its innovative and premium solutions[,]" and quoted Defendant Jenkins as stating, in relevant part:

> This strategic acquisition is a significant milestone in our global fire services expansion efforts, enhancing our product portfolio and strengthening our commitment to delivering exceptional fire turnout protection offerings to our customers worldwide. Pacific is a global brand with a well-established reputation for quality and innovative fire and rescue helmet design and manufacturing in the growing first responder safety helmet market. Pacific has a broad range of helmet models, styles and certifications, and they have demonstrated the ability to develop new products and sell successfully around the world. We expect Pacific to add seven to eight million dollars of sales revenue to Lakeland in our next fiscal year and to be immediately accretive.[]
>
> [. . . ]This acquisition significantly expands Lakeland's fire product offerings to our existing customer base while enhancing our geographic reach in Australia and New Zealand. Importantly, Pacific is highly complementary to Lakeland's current fire service business. The addition of Pacific's products and capabilities to Lakeland's portfolio presents a compelling cross-selling opportunity that we will be able to leverage across Lakeland's global sales and distribution channels. The combination of a complementary, premium product portfolio, global reach, talented team, and cross-selling opportunities makes this a great strategic fit for Lakeland.

36.    On December 6, 2023, Lakeland issued a press release reporting its financial results for Q3 of its FY 2024. The press release quoted Defendant Jenkins as touting Lakeland's SSQ M&A strategy, including its recent acquisition of Pacific Helmets, stating, in relevant part:

> Pacific has one of the broadest ranges of helmet models, styles, and certifications globally, with a track record of innovation and design and a strong, growing

revenue pipeline. Not only does this acquisition expand Lakeland's global fire service product offerings, it also strengthens our geographic diversity, particularly in Australia and New Zealand, and presents a cross-selling opportunity across Lakeland's existing sales and distribution channels. This acquisition reflects our commitment to executing and accelerating the pace of our [SSQ] M&A strategy, and we look forward to investing strategically to broaden and diversify Lakeland's range of products and end markets.

* * *

We are pleased with the progress of our acquisition strategy and how it positions us for growth in revenue and profitability.

37. On December 7, 2023, Lakeland filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q3 ended October 31, 2023 (the "Q3 2024 10-Q"). That filing represented that "[t]he [Pacific Helmets] acquisition enhances Lakeland's product portfolio," while touting Pacific Helmets' purported "leading design[] and provi[sion] of structural firefighting, wildland firefighting, and technical rescue helmets."

38. Appended as exhibits to the Q3 2024 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Roberson and Shannon certified that the Q3 2024 10-Q "does not contain any untrue statements of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

39. On February 5, 2024, Lakeland issued a press release announcing its acquisition of Jolly. The press release touted Jolly's purported "differentiated product portfolio through its continued investment in research and development and use of modern materials and cutting-edge technologies in the production of its footwear[,]" and quoted Defendant Jenkins as stating, in relevant part:

This strategic acquisition is another significant milestone in our global fire services expansion efforts . . . . Jolly's strong brand has a well-established reputation for quality and innovative professional footwear design and manufacturing in the

growing first responder safety market. Jolly has a comprehensive range of boot models, styles, and certifications and has demonstrated the ability to develop new products and sell successfully around the world. We expect Jolly to add $14 to $16 million of sales revenue to Lakeland this fiscal year and to be immediately accretive.[]

[. . . . ]This acquisition significantly expands Lakeland's fire product offerings to our existing customer base while enhancing our geographic presence in continental Europe and other international locales. Importantly, Jolly is highly complementary to Lakeland's current fire service business. The addition of Jolly's products and capabilities to Lakeland's portfolio presents another compelling cross-selling opportunity that we will be able to leverage across Lakeland's global sales and distribution channels. The combination of a complementary, premium product portfolio, global reach, talented team, and cross-selling opportunities makes this a great strategic fit for Lakeland.

40.     On April 10, 2024, Lakeland issued a press release reporting its financial results for its Q4 and FY of 2024.  The press release quoted Defendant Jenkins as touting Lakeland's SSQ M&A strategy, including its acquisitions of Pacific Helmets and Jolly, stating, in relevant part:

Our fire services business, a key strategic growth focus for the Company, continues to expand and grew over 80% versus last fiscal year, driven by our strategic acquisitions, superior lead times and onboarding successes with new distributors . . . . We are . . . excited about the growth potential of our recently acquired Pacific Helmet and Jolly Boots businesses[.]

* * *

Jolly . . . manufactures and sells a premium boots product line with a global reputation for safety, design and innovation. Along with our Pacific Helmets acquisition, the Jolly acquisition . . . strengthens our geographic diversity, and presents exciting cross-selling opportunities with global certifications across Lakeland's existing sales and distribution channels . . . . These acquisitions reflect our commitment to executing and accelerating the pace of our [SSQ] M&A strategy, and we look forward to investing strategically to broaden and diversify Lakeland's range of products and end markets.

* * *

We are pleased with the progress of our acquisition strategy and how it positions us for growth in revenue and profitability . . . . We enter Fiscal 2025 with momentum and high expectations.

41.     On April 11, 2024, Lakeland filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for its Q4 and FY ended January 31, 2024 (the "2024 10-K"). The 2024 10-K repeatedly represented that "[t]he [Pacific Helmets] acquisition enhances Lakeland's product portfolio," while touting Pacific Helmets' "leading design[] and provi[sion] of structural firefighting, wildland firefighting, and technical rescue helmets" and "differentiated product offerings through its innovative and premium solutions."

42.     The 2024 10-K also repeatedly touted Jolly as "a leading designer and manufacturer of professional footwear for the firefighting, military, police, and rescue markets" that "provides a differentiated product portfolio through its continued investment in research and development and the use of modern materials and cutting-edge technologies in the production of its footwear."

43.     Appended as exhibits to the 2024 10-K were substantively the same SOX certifications as referenced in ¶ 38, *supra*, signed by Defendants Jenkins and Shannon.

44.     On June 4, 2024, Lakeland issued a press release reporting its financial results for Q1 of its FY 2025. The press release quoted Defendant Jenkins as touting Lakeland's SSQ M&A strategy, including its acquisitions of Pacific Helmets and Jolly, stating, in relevant part:

> Lakeland delivered strong [Q1] results as we continued to execute on our commitment to expand our fire services business globally through organic growth and strategic acquisitions and to accelerate the growth of our industrial safety products[.]
>
> * * *
>
> We also are encouraged by the sales results from our recent acquisitions as we saw combined sales of $3.9 million from Pacific Helmets . . . and Jolly . . . . Over the coming months, we will continue to integrate Pacific's and Jolly's outstanding fire safety products into Lakeland's global sales channels and marketing platforms as we work to proactively leverage synergies across our global portfolio through market expansion and cross-selling opportunities. Our fire services business, a key strategic growth focus for the Company, grew over 92% versus the same period last year, driven both by our Jolly and Pacific strategic acquisitions and organic growth

as a result of our superior lead times and onboarding successes with new distributors.

* * *

We are pleased with our [Q1] results and the progress to date of our acquisition strategy. We continue to believe our SSQ acquisition strategy and the investments we are making in our sales strategies position us for growth in revenue and profitability. We entered Fiscal 2025 with momentum and high expectations, and we believe we are off to a strong start.

45.     On June 6, 2024, Lakeland filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q1 ended April 30, 2024 (the "Q1 2025 10-Q"). The Q1 2025 10-Q repeatedly represented that "[t]he [Pacific Helmets] acquisition enhances Lakeland's product portfolio," while touting Pacific Helmets' "leading design[] and provi[sion] of structural firefighting, wildland firefighting, and technical rescue helmets."

46.     The Q1 2025 10-Q also contained the same statements as referenced in ¶ 42, *supra*, regarding the purported benefits and advantages that Lakeland enjoyed as a result of its acquisition of Jolly, as well as the purported strength and quality of Jolly's operations.

47.     Appended as exhibits to the Q1 2025 10-Q were substantively the same SOX certifications as referenced in ¶ 38, *supra*, signed by Defendants Jenkins and Shannon.

48.     On July 1, 2024, Lakeland issued a press release announcing its acquisition of the fire and rescue business of LHD Group Deutschland GmbH and its subsidiaries in Hong Kong and Australia (collectively, "LHD"). The press release stated, in relevant part, that "[w]e expect FY25 Adjusted EBITDA, excluding any material negative impact from [FX], to be in the range of $18 million to $21.5 million[.]"

49.     The statements referenced in ¶¶ 35-48 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made

false and/or misleading statements and/or failed to disclose that: (i) Lakeland was experiencing significant, sustained issues with its Pacific Helmets and Jolly businesses, including, *inter alia*, shipping-related delays, production issues, and slower than expected rollout of new products; (ii) accordingly, Defendants overstated the anticipated and actual positive impact of these businesses on Lakeland's financial results, as well as the overall strength and quality of Pacific Helmets' and Jolly's respective operations; (iii) as a result of the foregoing issues, Defendants' financial guidance was unreliable; and (iv) as a result, Defendants' public statements were materially false and misleading at all relevant times.

### **The Truth Begins to Emerge**

50.    The truth began to emerge on September 4, 2024, when, during post-market hours, Lakeland issued a press release reporting its financial results for Q2 of its FY 2025.  Among other results, Lakeland reported revenue of $38.51 million for the quarter, missing consensus estimates by $1.39 million.  As quoted in the press release, Defendant Jenkins revealed "the shortfall was due to shipment timing," and that, *inter alia*, Jolly had "substantial fire orders delayed to the late third and early fourth quarter."

51.    On this news, Lakeland's stock price fell $1.86 per share, or 7.82%, to close at $21.92 per share on September 5, 2024.  Despite this decline in the Company's stock price, Lakeland securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions regarding, *inter alia*, the Company's Pacific Helmets and Jolly businesses, as well as the reliability of Lakeland's financial guidance.

52.     For example, the same press release reassured investors that "[w]e continue to expect FY25 Adjusted EBITDA, excluding any material negative impact from [FX], to be in the range of $18 million to $21.5 million[.]"

53.     In addition, the press release quoted Defendant Jenkins as stating, *inter alia*, that "we remain confident in our full-year projections[,]" that "we are confident in our growth strategy and our expanding market opportunities[,]" that "[w]e expect . . . the growth of our industrial safety products will accelerate in the second half of our fiscal year[,]" that although "revenue in the fire space can be 'lumpy' due to the timing of tenders, . . . we have visibility to increased shipments in the second half[,]" and that "[w]e expect to be less susceptible to revenue timing swings as we gain critical mass in the fire space."

54.     The press release also quoted Defendant Jenkins as touting the purported strength of Lakeland's SSQ M&A strategy, stating, in relevant part:

> We continue to believe our SSQ acquisition strategy and the investments we are making in our sales strategies position us for growth in revenue and profitability. In the second half of the year, we will continue to drive operational improvements throughout the organization. We are laser-focused on improving productivity and expect more gross profit to be generated. In fact, we expect the increase in productivity to significantly help to offset the setbacks caused by the timing slippage of Q2 orders[.]

55.     On September 6, 2024, Lakeland filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q2 ended July 31, 2024 (the "Q2 2025 10-Q").   That filing contained the same statements as referenced in ¶ 45, *supra*, regarding the purported benefits and advantages that Lakeland enjoyed as a result of its acquisition of Pacific Helmets, as well as the purported strength and quality of Pacific Helmets' operations.

56.     Likewise, the Q2 2025 10-Q continued to tout Jolly as "a leading designer and manufacturer of professional footwear for the firefighting, military, police, and rescue markets."

57.     Appended as exhibits to the Q2 2025 10-Q were substantively the same SOX certifications as referenced in ¶ 38, *supra*, signed by Defendants Jenkins and Shannon.

58.     On December 5, 2024, Lakeland issued a press release reporting its financial results for Q3 of its FY 2025.  The press release stated that "[w]e continue to expect FY25 Adjusted EBITDA, excluding any material negative impact from [FX], to be at least $18 million[,]" and quoted Defendant Jenkins as stating that "we remain confident in our full-year projections[.]"

59.     Similarly, the press release quoted Defendant Shannon as stating, *inter alia*, that "[g]iven the totality of our positive results, trends and expectations, we continue to expect . . . Adjusted EBITDA excluding FX of at least $18 million," and that Lakeland's elevated cash usage in the quarter "suggests strong demand from our customers as the increase was driven by increases in working capital of $12.5 million, primarily due to a build in inventory in preparation for the forecasted increase in sales in [Q4] of the year and [Q1] of fiscal 2026, and which we expect to recover in the first half of fiscal 2026."

60.     On December 10, 2024, Lakeland filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q3 ended October 31, 2024 (the "Q3 2025 10-Q").  The Q3 2025 10-Q contained the same statements as referenced in ¶¶ 45 and 56, *supra*, touting the purported strength and quality of Pacific Helmets' and Jolly's respective operations.

61.     Appended as exhibits to the Q3 2025 10-Q were substantively the same SOX certifications as referenced in ¶ 38, *supra*, signed by Defendants Jenkins and Shannon.

62.     The statements referenced in ¶¶ 52-61 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made

false and/or misleading statements and/or failed to disclose that: (i) Lakeland was experiencing significant, sustained issues with its Pacific Helmets and Jolly businesses, including, *inter alia*, shipping-related delays, production issues, and slower than expected rollout of new products; (ii) accordingly, Defendants overstated the anticipated and actual positive impact of these businesses on Lakeland's financial results, as well as the overall strength and quality of Pacific Helmets' and Jolly's respective operations; (iii) as a result of the foregoing issues, Defendants' financial guidance was unreliable; and (iv) as a result, Defendants' public statements were materially false and misleading at all relevant times.

63.     With its stock price artificially inflated by the foregoing false and/or misleading statements and omissions, on January 24, 2025, Lakeland announced its closure of an underwritten public offering of 2,093,000 shares of its common stock at a public offering price of $22.00 per share, which included the exercise in full by the underwriter of its option to purchase 273,000 additional shares of Lakeland's common stock (the "January 2025 Offering").  Gross proceeds to Lakeland, before deducting the underwriting discount and estimated offering expenses payable by Lakeland, were approximately $46 million.

## The Truth Continues to Emerge

64.     The truth continued to emerge on April 9, 2025, when, during post-market hours, Lakeland issued a press release reporting its financial results for its Q4 and FY of 2025.  Among other results, Lakeland reported Q4 GAAP EPS of -$2.42, missing consensus estimates by $2.80, and FY 2025 adjusted EBITDA, excluding FX losses, of only $17.4 million— ***significantly below Defendants' repeatedly reiterated guidance of EBITDA of at least $18 million***.  As quoted in the press release, Defendant Shannon acknowledged that "[t]he shortfall in our annual Adjusted EBITDA guidance was a direct result of the slippage of a large boot order at Jolly into FY26."

17

Defendant Jenkins, as also quoted in the press release, likewise blamed Lakeland's disappointing results on, *inter alia*, the "large Jolly fire boots order that was initially expected to ship in Q2 of FY25 [that] has now slipped into FY26," as well as "weakness . . . at Pacific Helmets resulting from production issues and product offering updates" and a "slower than expected" "rollout of new products from Pacific Helmets and Jolly Boots[.]"

65.    On this news, Lakeland's stock price fell $2.63 per share, or 14.33%, to close at $15.72 per share on April 10, 2025.  Despite this decline in the Company's stock price, Lakeland securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions regarding, *inter alia*, the Company's Pacific Helmets and Jolly businesses, the reliability of Lakeland's financial guidance, and the purported strength of its tariff mitigation measures and SSQ M&A strategy.

66.    For example, the same press release described at length Defendants' confidence in Lakeland's various tariff mitigation measures, stating, *inter alia*:

### *Tariff Mitigation Measures*

- Inventory Buildup:
    - Increase in net inventories of $14.2 million ahead of imposed tariffs.
    - Inventories on January 31, 2025, totaled $82.7 million.
- US and Mexico Production:
    - Majority of legacy Lakeland products manufactured in Mexico are exempt from additional tariffs under USMCA.
    - Domestic Lakeland U.S. Fire Services orders can be fulfilled by Veridian.
    - Lakeland & Veridian sharing fire turnout compliance under NFPA1970 standard requirements.
    - Lakeland Mexico and Veridian have begun sharing technical documentation to facilitate future cross-production initiatives.
- Vietnam and China:
    - Expected price increase/surcharges communicated to channel partners for products made in Vietnam and China.
    - Monitoring real-time Vietnam tariff negotiations for potential renegotiation.

- A limited range of China-produced products are imported into the U.S.
- Retaliatory Tariffs:
  - The exposure of retaliatory tariffs by foreign entities against the U.S. is mitigated by primarily non-U.S. Lakeland facilities supplying products to non-U.S. markets.
  - Mexico facility to produce Veridian's Latin America and Canadian Fire Services orders.

(Emphases in original.)

67. Further, the press release quoted Defendant Jenkins as stating, in relevant part:

[W]e have taken several steps to help mitigate the effects . . . tariffs will or might have. First, in anticipation of the potential tariffs, we strategically pre-positioned certain Asian-produced inventory into the U.S., which also helps support our planned [FY] 2026 growth. While developments on the ground seemingly change by the day, we are focusing on production shifts to incur the lowest possible tariffs on our products. In Asia, these measures include moving certain production from China to Vietnam and exploring other lower tariff regions for manufacturing industrial products and price increases. We are continuing to closely monitor the Vietnam tariff situation as a significant portion of our US disposable products are manufactured at our Vietnam facility, and we are hopeful that a reduced tariff agreement will soon be reached with that country. In the meantime, we are continuing to assess the possibility of manufacturing disposable products at our newly acquired US manufacturing facilities or other Lakeland facilities around the world.

[]In the North American marketplace, our tariff mitigation initiatives include cross-certification of Lakeland's Mexico-produced fire turnout gear by Veridian for production in the US. All Veridian turnout gear is currently manufactured in the US, and these facilities have the capacity to manufacture the Lakeland brand of turnout gear. Additionally, our Mexico facility is becoming certified to produce Veridian turnout gear for the Canadian and LATAM markets in our Mexico facility. Immediately following our acquisition of Veridian, Lakeland and Veridian began sharing compliance under the NFPA1970 certification requirements, while our Jerez, Mexico facility and Veridian have begun sharing technical documentation to facilitate cross-production initiatives. We were also pleased that over 90% of our Mexico-produced products that fall under the provisions of the USMCA trade agreement are not subject to additional tariffs. Finally, we believe that the Company is protected against potential retaliatory tariffs by foreign entities as non-U.S. Lakeland facilities supply the majority of Lakeland's products to non-U.S. markets.

68. The press release also quoted Defendant Jenkins as assuring investors that, "[w]hile our [Q4] results at Jolly and Pacific did not meet our expectations, we remain very excited and

optimistic about these brands and expect sales to accelerate as we deliver on open orders, introduce new helmet and boot lines, and capitalize on cross-selling opportunities."

69.     The press release also stated that "[w]e expect FY 2026 Revenue of $210 to $220 million" and "FY 2026 Adjusted EBITDA, excluding any material negative impact from [FX], of $24 to $29 million."

70.     In support of this guidance, Defendant Shannon, as quoted in the same press release, stated, in relevant part, that "[g]iven the totality of our positive results, trends and expectations, we expect [FY] 2026 revenue of $210 to $220 million and Adjusted EBITDA excluding FX of $24 to $29 million," and that Lakeland's elevated cash usage in the quarter "suggests strong demand from our customers as the increase was driven by increases in working capital of $18.4 million, primarily due to a build in inventory in preparation for the forecasted increase in sales in the first half of fiscal 2026, and the impact of clearing approximately 85% of the multi-year backlog at LHD which we expect to recover in the first half of fiscal 2026."

71.     On April 17, 2025, Lakeland filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for its Q4 and FY ended January 31, 2025 (the "2025 10-K").  The 2025 10-K contained the same statements as referenced in ¶¶ 41-42, *supra*, regarding the purported benefits and advantages that Lakeland enjoyed as a result of its acquisitions of Pacific Helmets and Jolly, as well as the purported strength and quality of those businesses' respective operations.

72.     Appended as exhibits to the 2025 10-K were substantively the same SOX certifications as referenced in ¶ 38, *supra*, signed by Defendants Jenkins and Shannon.

73.     The statements referenced in ¶¶ 66-72 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse

facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Lakeland was experiencing significant, sustained issues with its Pacific Helmets and Jolly businesses, including, *inter alia*, shipping-related delays, production issues, and slower than expected rollout of new products; (ii) accordingly, Defendants overstated the anticipated and actual positive impact of these businesses on Lakeland's financial results, as well as the overall strength and quality of Pacific Helmets' and Jolly's respective operations; (iii) Lakeland's business and financial results were significantly deteriorating because of, *inter alia*, tariff-related headwinds and timing, certification delays, and material flow issues in its acquired businesses; (iv) accordingly, Defendants overstated the strength of their tariff mitigation measures and SSQ M&A strategy; (v) as a result of all the foregoing issues, Defendants' financial guidance was unreliable; and (vi) as a result, Defendants' public statements were materially false and misleading at all relevant times.

74.    On June 9, 2025, during post-market hours, Lakeland issued a press release reporting its financial results for Q1 of its FY 2026.  Among other results, Lakeland reported Q1 GAAP EPS of -$0.41, missing consensus estimates by $0.60, as well as revenue of $46.74 million, missing consensus estimates by $2.1 million.  Defendant Jenkins, as quoted in the press release, blamed these disappointing results on, *inter alia*, the Pacific Helmets business "resulting from production issues and updates to product offerings[,]" as well as "shipment timing" and "tariff-related delays" and "tariff uncertainty[.]"  Defendant Shannon, as quoted in the same press release, likewise disclosed that "[t]he shortfall [in adjusted EBITDA in the quarter] was a direct result of[,]" *inter alia*, "elevated freight costs resulting from tariff-related inventory build, and dilution from acquisitions."

75.    On this news, Lakeland's stock price fell $4.29 per share, or 22.16%, to close at $15.07 per share on June 10, 2025.  Despite this decline in the Company's stock price, Lakeland securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions regarding, *inter alia*, the Company's Pacific Helmets and Jolly businesses, the reliability of Lakeland's financial guidance, and the purported strength of its tariff mitigation measures and SSQ M&A strategy.

76.    For example, the same press release represented that "*Improving Global Tariff Environment & Reduction in Mitigation Strategies Positions Company for Sequential Growth in Gross Margin and Adjusted EBITDA Excluding FX in Q2'26*" (emphasis in original), while providing the following updates regarding the Company's tariff mitigation measures:

### *Tariff Mitigation Measures Updates*

- Inventory Buildup:
  - Increase in net inventories of $3.1 million ahead of imposed tariffs.
  - Inventories on April 30, 2025, totaled $85.8 million.
- Tariff Mitigation Measures Updates:
  - Strategic inventory stocking, including raw materials and finished goods
  - Production shift in Asia to lower-tariff countries
  - Lakeland Mexico's USMCA-compliant products are tariff-exempt
  - Production of Lakeland Fire Gear in the U.S. at Veridian

(Emphases in original.)

77.    The press release also stated that "[w]e expect FY 2026 Revenue of $210 to $220 million" and that, notwithstanding "lower margins, near-term order delays, uncertainty related to tariffs and higher operating expenses in [Q1], we expect FY 2026 Adjusted EBITDA, excluding any material negative impact from [FX], to be in the lower end of a range of $24 million to $29 million."

78.    Also on June 9, 2025, Lakeland filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q1 ended April 30, 2025 (the "Q1 2026 10-Q").  The Q1 2026 10-Q contained the same statements as referenced in ¶ 56, *supra*, touting the purported strength and quality of Jolly's operations.

79.    Appended as exhibits to the Q1 2026 10-Q were substantively the same SOX certifications as referenced in ¶ 38, *supra*, signed by Defendants Jenkins and Shannon.

80.    The statements referenced in ¶¶ 76-79 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Lakeland was experiencing significant, sustained issues with its Pacific Helmets and Jolly businesses, including, *inter alia*, shipping-related delays, production issues, and slower than expected rollout of new products; (ii) accordingly, Defendants overstated the anticipated and actual positive impact of these businesses on Lakeland's financial results, as well as the overall strength and quality of Pacific Helmets' and Jolly's respective operations; (iii) Lakeland's business and financial results were significantly deteriorating because of, *inter alia*, tariff-related headwinds and timing, certification delays, and material flow issues in its acquired businesses; (iv) accordingly, Defendants overstated the strength of their tariff mitigation measures and SSQ M&A strategy; (v) as a result of all the foregoing issues, Defendants' financial guidance was unreliable; and (vi) as a result, Defendants' public statements were materially false and misleading at all relevant times.

81.    On September 9, 2025, during post-market hours, Lakeland issued a press release reporting its financial results for Q2 of its FY 2026.  Among other results, Lakeland reported revenue of $52.5 million for the quarter, missing consensus estimates by $2.09 million.  Defendant

Jenkins, as quoted in the press release, once again blamed these disappointing results on, *inter alia*, "Pacific Helmets resulting from updates to product offerings and production issues[,]" as well as "continued delays in purchasing decisions due to tariff uncertainty[.]"

82.    On this news, Lakeland's stock price fell $0.64 per share, or 4.43%, to close at $13.80 per share on September 10, 2025.  Despite this decline in the Company's stock price, Lakeland securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions regarding, *inter alia*, the Company's Pacific Helmets and Jolly businesses, the reliability of Lakeland's financial guidance, and the purported strength of its tariff mitigation measures and SSQ M&A strategy.

83.    For example, the same press release stated, in relevant part, that "[w]e expect FY26 revenue to be between $210 million and $220 million" and that, notwithstanding "lower margins, near-term order delays, uncertainty related to tariffs and higher operating expenses, we expect FY 2026 adjusted EBITDA, excluding any material negative impact from [FX], to be in the range of $20 million to $24 million."

84.    The press release also quoted Defendant Jenkins as stating, in relevant part, that "we expect to see measurable progress by year-end[,]" "[w]e believe that our proactive approach to inventory management, combined with the upcoming tender cycle, will position us for stronger execution in the back half of FY26 and build momentum heading into FY27[,]" and that "Lakeland is incredibly well-positioned to capitalize on long-term industry tailwinds and structural shifts in global safety standards."

85.    Also on September 9, 2025, Lakeland filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q2 ended July 31, 2025

(the "Q2 2026 10-Q").  The Q2 2026 10-Q contained the same statements as referenced in ¶ 56, *supra*, touting the purported strength and quality of Jolly's operations.

86.    Appended as exhibits to the Q2 2026 10-Q were substantively the same SOX certifications as referenced in ¶ 38, *supra*, signed by Defendants Jenkins and Shannon.

87.    The statements referenced in ¶¶ 83-86 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Lakeland was experiencing significant, sustained issues with its Pacific Helmets and Jolly businesses, including, *inter alia*, shipping-related delays, production issues, and slower than expected rollout of new products; (ii) accordingly, Defendants overstated the anticipated and actual positive impact of these businesses on Lakeland's financial results, as well as the overall strength and quality of Pacific Helmets' and Jolly's respective operations; (iii) Lakeland's business and financial results were significantly deteriorating because of, *inter alia*, tariff-related headwinds and timing, certification delays, and material flow issues in its acquired businesses; (iv) accordingly, Defendants overstated the strength of their tariff mitigation measures and SSQ M&A strategy; (v) as a result of all the foregoing issues, Defendants' financial guidance was unreliable; and (vi) as a result, Defendants' public statements were materially false and misleading at all relevant times.

88.    On December 9, 2025, during post-market hours, Lakeland issued a press release reporting its financial results for Q3 of its FY 2026 (the "Q3 2026 Earnings Release").  Among other results, Lakeland reported Q3 2026 GAAP EPS of -$1.64, missing consensus estimates by $1.93, and revenue of $47.6 million, missing consensus estimates by $9.05 million, blaming, *inter alia*, "timing, certification delays, and material flow issues" in its acquired businesses, as well as

tariff-related headwinds.  The press release further revealed that Lakeland was withdrawing its previously issued financial guidance for FY 2026 and would not provide financial guidance going forward because the foregoing "challenges have affected our forecasting ability[.]"  The press release quoted Defendant Jenkins as stating, *inter alia*:

> Several macroeconomics factors . . . contributed to the quarter's results, ***including tariffs, freight, raw material inflation and rising supply-chain costs that drove both revenue and gross margin shortfalls***. For Lakeland, revenue softness was visible across our portfolio in the U.S., Canada, Latin America, and parts of EMEA [Europe, the Middle East and Africa]. North America faced challenges with revenue down quarter over quarter and Latin America came in below our plan ***due to macro-economic conditions impacted by political uncertainty. Our acquired businesses also came in below our plan due to timing, certification delays, and material flow issues, rather than underlying demand. The revenue misses directly reduced gross profit dollars, removing the operating leverage we depend on to convert volume into earnings.*** While revenue has grown, ***margin pressure has driven a decline in adjusted EBITDA as freight, mix and tariffs weighed on results.*** Throughput and mix inefficiencies affected costs and labor, and our mix shifted away from higher-margin categories . . . . ***[T]hese challenges have affected our forecasting ability and, as a result, we are withdrawing our previously issued financial guidance for FY2026 and will not be providing financial guidance going forward.***

(Emphases added.)

89.    The same day, also during post-market hours, Lakeland filed a current report on Form 8-K with the SEC (the "Q3 2026 8-K"), disclosing that, "[o]n December 4, 2025, the Company and [Defendant] Shannon . . . mutually agreed that [Defendant] Shannon's employment will terminate effective December 31, 2025."

90.    Multiple news outlets reported on the significant negative impact that the foregoing disclosures had on the market for Lakeland's shares.  For example, in an article published the same day, entitled "Lakeland Industries tumbles as Q3 results swing to loss[,]" *Investing.com* reported that the Company's "shares plunged 19.5% in after-hours trading . . . after the protective clothing manufacturer reported a significant [Q3] loss and suspended both its financial guidance and

quarterly dividend."  The article noted that Lakeland's Q3 "loss of $16 million, or -$1.64 per share, [was] a dramatic reversal from the $0.01 per share profit reported in the same period last year[,]" and that "gross profit plummeted 24% to $14.1 million, with gross margins contracting sharply to 29.7% from 40.6% a year earlier."

91.    In another article published the following day, entitled "Lakeland shares slide on disappointing Q3, but firm says challenges aren't structural[,]" *Seeking Alpha* reported that the Company's share price "fell 21% in early Wednesday trading after the company missed earnings estimates and withdrew its guidance, citing industry-wide challenges such as tariffs."

92.    Further, multiple analysts expressed surprise with Lakeland's disappointing results, noting that the Company's credibility had been tarnished.  For example, on December 9, 2025, Roth Capital Partners reduced its price target ("PT") on Lakeland stock to $19.00 from $27.00, calling the Company's Q3 2026 "challenging and a disappointment" with "results . . . even more challenging than anticipated" and "more challenged than modeled[,]" stating that "in the near term the stock likely remains under pressure from . . . lack of confidence in execution."

93.    Likewise, on December 10, 2025, D.A. Davidson downgraded its recommendation on Lakeland to neutral from buy, and its PT on the Company's stock to $14.00 from $20.00, stating that "we believe LAKE has a lot of credibility to earn back before the stock can work again" after "the company missed F3Q expectations substantially; withdrew guidance; suspended the dividend; terminated its CFO; and noted significant end-market uncertainties ahead."

94.    The same day, Lake Street Capital Markets Lowered its PT on Lakeland's stock to $19.00 from $26.00, noting that "Lakeland reported [Q3] results that came well below our estimates."

95.     Also on December 10, 2025, Maxim Group lowered its PT on Lakeland's stock to $14.00 from $24.00, stating that "[w]e lower our FY26 and FY27 revenue and adjusted EBITDA estimates due to low visibility, withdrawn guidance, and macro pressure," while noting the Company's issues were "exacerbated by acquisition integration efforts" and, *inter alia*, "the late completion of a new standard for fire safety gear delayed orders."

96.     Following the foregoing developments, Lakeland's stock price fell $5.85 per share, or 38.97%, to close at $9.16 per share on December 10, 2025.

97.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**Regulation S-K Item 303**

98.     In addition, Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required Lakeland to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Defendants' failure to disclose, *inter alia*, significant, sustained issues with the Company's Pacific Helmets and Jolly businesses, as well as the ineffectiveness of its tariff mitigation measures and SSQ M&A strategy, violated Item 303 because these issues represented known trends or uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

**SCIENTER ALLEGATIONS**

99.     During the Class Period, Defendants had both the motive and opportunity to commit fraud.  For example, while disseminating the materially false and misleading statements alleged herein to maintain artificially inflated prices for Lakeland securities, Defendants sold

millions of shares of the Company's common stock to investors via the January 2025 Offering, reaping gross proceeds of tens of millions of dollars.

100.    Defendants also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  Indeed, throughout the Class Period, Defendants were highly focused on, *inter alia*, the Company's SSQ M&A strategy, which was central to Lakeland's revenue and profitability growth thesis. Defendants were also laser focused on the Pacific Helmets and Jolly acquisitions and those businesses' subsequent performance, as well as the Company's ability to withstand tariff-related headwinds throughout the Class Period.  Defendants' unwavering attention to these issues was apparent via their various detailed statements regarding these aspects of the Company's business in numerous financial reports and press releases throughout the Class Period.  Defendants were likewise undoubtedly focused on the financial guidance they provided to investors throughout the Class Period, repeatedly reiterating their confidence in said guidance at all relevant times, notwithstanding acknowledged headwinds.

101.    Accordingly, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

102.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Lakeland securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate

families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

103.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Lakeland securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Lakeland or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

104.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

105.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

106.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Lakeland;

- whether the Individual Defendants caused Lakeland to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Lakeland securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

107.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

108.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Lakeland securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Lakeland securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

109.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

110.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

111.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

112.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

113.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Lakeland securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Lakeland

securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

114.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Lakeland securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Lakeland's finances and business prospects.

115.    By virtue of their positions at Lakeland, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

116.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Lakeland, the Individual Defendants had knowledge of the details of Lakeland's internal affairs.

117.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Lakeland.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Lakeland's businesses, operations, future financial condition and future prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Lakeland securities was artificially inflated throughout the Class Period.   In ignorance of the adverse facts concerning Lakeland's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Lakeland securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

118.    During the Class Period, Lakeland securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Lakeland securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Lakeland securities was substantially lower than the prices paid by Plaintiff and the other

members of the Class.  The market price of Lakeland securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

119.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

120.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

121.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

122.    During the Class Period, the Individual Defendants participated in the operation and management of Lakeland, and conducted and participated, directly and indirectly, in the conduct of Lakeland's business affairs.  Because of their senior positions, they knew the adverse non-public information about Lakeland's misstatement of income and expenses and false financial statements.

123.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Lakeland's financial condition and results of operations, and to correct promptly any public statements issued by Lakeland which had become materially false or misleading.

124.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Lakeland disseminated in the marketplace during the Class Period concerning Lakeland's results of operations.    Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Lakeland to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Lakeland within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Lakeland securities.

125.    Each of the Individual Defendants, therefore, acted as a controlling person of Lakeland.  By reason of their senior management positions and/or being directors of Lakeland, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Lakeland to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Lakeland and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

126.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Lakeland.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: February 23, 2026                    Respectfully submitted,

                                POMERANTZ LLP

                                */s/ Jeremy A. Lieberman*
                                Jeremy A. Lieberman
                                J. Alexander Hood II
                                James M. LoPiano
                                600 Third Avenue, 20th Floor
                                New York, New York 10016
                                Telephone: (212) 661-1100
                                Facsimile: (917) 463-1044
                                jalieberman@pomlaw.com
                                ahood@pomlaw.com
                                jlopiano@pomlaw.com

                                *Attorneys for Plaintiff*