**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE LAKELAND INDUSTRIES SECURITIES LITIGATION | 26cv1501 (DLC)<br><br>AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED<br><br>CLASS ACTION |

## TABLE OF CONTENTS

Pages


I. NATURE OF THE CASE ........ 1

II. JURISDICTION AND VENUE ........ 4

III. PARTIES ........ 4

IV. SUBSTANTIVE ALLEGATIONS ........ 9

A. Background ........ 9

B. FE-1 Informed Defendants Directly That Lakeland's Consolidated Results Were Materially False for Failing to Eliminate Intercompany Transactions, but Rather Than Restating and Correcting, Defendants Demanded That FE-1 Falsify the Regional Numbers ........ 10

C. Lakeland Fires its Auditor Deloitte & Touche Just After the Whistleblower Confronts Defendants About Their Fraudulent Scheme ........ 12

D. Defendants' Fraud Rendered Lakeland's Financial Statements Materially Misleading ........ 14

1. Relevant General Accounting Principles ........ 14

2. Materiality ........ 16

3. Elimination of Intercompany Transactions ........ 17

4. Segment Reporting Requirements ........ 17

5. Defendant Jenkins' Direct Oversight of Segment Reporting ........ 19

6. The Scheme's Impact on Lakeland's Reported Financial Results ........ 20

E. Defendants Orchestrate an Equity Offering Leveraging Lakeland's Materially False Financial Results and Books and Disregarding the Whistleblower's Credible Allegations ........ 22

F. Defendants Fire the Whistleblower for Refusing to Cook the Books ........ 24

V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS ........ 24

VI. THE TRUTH BEGINS TO EMERGE ........ 31

VII. PLAINTIFFS' CLASS ACTION ALLEGATIONS ........ 39

VIII. COUNTS ........ 41

IX. PRAYER FOR RELIEF ........................................................................................ 44

X. JURY TRIAL DEMANDED ................................................................................... 45

1. Lead Plaintiff Milan Fortner ("Lead Plaintiff") and Additional Plaintiff David Ruxin (collectively, "Plaintiffs"), individually and on behalf of all persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' Amended Complaint against Defendants Lakeland Industries, Inc. ("Lakeland" or "Company"), James M. Jenkins ("Jenkins"), Roger D. Shannon ("Shannon"), Barry Phillips ("Phillips") and Angela An ("An" and with Lakeland, Jenkins, Shannon and Phillips, "Defendants"), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Lakeland, witness interviews, consultation with experts, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE CASE

2. This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Lakeland common stock between September 4, 2024, and December 9, 2025, inclusive ("Class Period"), seeking to recover compensable damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5(b), and Rules 10-b5(a) and (c), promulgated thereunder.[1]

3. In late 2024, a whistleblower, Lakeland's Director of Global Sales Operations (referred to herein as the "whistleblower" or Former Employee 1 ("FE-1")), uncovered and conveyed directly to Defendants that Lakeland's global sales data at the entity level did not match

[1] All emphases are added unless otherwise indicated.

Lakeland's financials at the Company level. It was the whistleblower's job to reconcile financial data, but the numbers did not reconcile with the Company's consolidated results.

4. When FE-1 dug deeper, he[2] learned that, in violation of generally accepted accounting principles ("GAAP"), Lakeland had been publishing financials from its Asia segment without eliminating intercompany sales, as GAAP required. This not only artificially inflated the Asia segment's reported sales, but falsely inflated the Company's consolidated revenues, earnings, gross profit, pre-tax income, adjusted EBITDA, and inventory levels, and understated the costs of the goods Lakeland reported.

5. FE-1 reported his findings to his boss. At first, FE-1 was met with indifference. But he persisted, reporting the failure of Defendants to eliminate intercompany transactions directly to Lakeland's senior management.

6. FE-1 told Lakeland's Chief Revenue Officer, Defendant Barry Phillips, and the Vice President of Global Marketing Brian Shockley that FE-1 knew that the Company was falsifying its reported financials, conveying that Lakeland's corporate finance function had failed to eliminate intercompany sales. FE-1 also told other members of senior leadership about the impropriety of failing to eliminate intercompany transaction and its material impact on Lakeland's consolidated results, including its CEO, Defendant Jenkins, its CFO, Defendant Shannon, and its Chief Operating Officer ("COO"), Defendant Helena An.

7. Defendants neither investigated, nor alerted Lakeland's Board of Directors, nor warned investors. On the contrary, Defendants knowingly or recklessly misled investors.

---

[2] FE-1 is referred to herein using the pronoun "he" as a generic reference without disclosing his/her identity.

8. ***First***, rather than instructing Lakeland's financial function to eliminate intercompany transactions to report materially accurate financial statements, Defendant Jenkins directly told FE-1 to manipulate the Asia numbers to match them to the materially false consolidated numbers Defendants disclosed to investors. FE-1 conveyed his refusal to manipulate revenue numbers, informing Defendants that any such manipulation would result in materially inaccurate financial results. Despite FE-1's blowing the whistle, however, Defendants falsified the numbers because they were courting a big investor.

9. ***Second***, in October 2024, in the wake of FE-1 telling Lakeland executives that he knew about the fraud, Lakeland fired its longtime external auditing firm Deloitte & Touche LLP ("Deloitte") "effective immediately" and without explanation. Deloitte had served as Lakeland's independent registered public accounting firm since 2020, and the Company's shareholders had overwhelmingly voted to retain Deloitte as the Company's independent auditor and to perform the Company's year-end audit.

10. ***Third***, Defendants leveraged their inflated results to float a secondary offering, selling over 2 million shares to the public at $22 per share, increasing the Company's market capitalization by approximately 25% and its outstanding shares by 28%. The $46 million stock offering was, relative to Lakeland's size, a material infusion of capital necessary to pay down debt and to acquire new companies—Lakeland's principal strategy for growing revenue.

11. At the end of the Class Period, after Defendants revealed the Company's financial condition was not nearly as strong as Defendants had knowingly or recklessly led investors to believe, Lakeland's common stock traded for under $10 per share. The Company's shares have not recovered in any meaningful way.

12. As a direct and proximate result of Defendants' wrongdoing, Plaintiffs and the Class have suffered damages.

## II. JURISDICTION AND VENUE

13. The claims alleged herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

14. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

15. Lakeland's principal executive office is located 1525 Perimeter Parkway, Suite 325, Huntsville, Alabama 35806.

16. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange. Defendants disseminated the statements alleged to be false and misleading herein into this District, and Defendants solicited purchasers of Lakeland common stock in this District.

## III. PARTIES

17. Plaintiffs, as set forth in Lead Plaintiff's previously filed Certification (ECF No. 13-2), incorporated by reference herein, and in Plaintiff Ruxin's Certification, attached hereto as Exhibit A, purchased Lakeland common stock at artificially inflated prices during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

18. Defendant Lakeland is a Delaware corporation with principal executive offices located at 1525 Perimeter Parkway, Suite 325, Huntsville, Alabama 35806. Lakeland's common

stock trades in an efficient market on the NASDAQ Global Market under the ticker symbol "LAKE."

19. Defendant James M. Jenkins ("Jenkins") has served on the Lakeland Board of Directors since 2012. He became Chairman of the Board on February 1, 2023, and Executive Chairman on August 30, 2023. Jenkins served as Lakeland's Acting Chief Executive Officer ("CEO") from February 1, 2024 to May 31, 2024, and has been the appointed CEO since June 1, 2024.

20. Defendant Roger D. Shannon ("Shannon") served as Lakeland's Chief Financial Officer ("CFO") from February 1, 2023 through December 31, 2025. The "mutual" decision to relieve Shannon of his duties was made on December 4, 2025, as announced on December 9, 2025.

21. Defendant Barry Phillips ("Phillips"), has served as in Lakeland's C-Suite as its Chief Revenue Officer ("CRO") since June 17, 2024.

22. Defendant Angela An ("An"), has served as Lakeland's Chief Operating Officer ("COO") since April 6, 2023. From 2018 until April 2023 she served as Lakeland's VP of Procurement and Asia Manufacturing

23. Defendants Jenkins, Shannon, Phillips, and An are referred to herein as the "Individual Defendants."

24. Defendants Jenkins and Shannon signed and certified all of Lakeland's quarterly reports on Form 10-Q, and Lakeland's Annual Reports on Form 10-K, during the Class Period. All certifications were pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.

25. For each certification described in the previous paragraph, the named Defendants certified that:

a. I have reviewed this [Quarterly Report on Form 10-Q/Annual Report on Form 10-K] for the period ended _____________;

b. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

c. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

d. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   i. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   ii. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

iii. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

iv. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

e. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

i. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting, which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

ii. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

26. For each periodic report during the Class Period, Defendants also certified that "pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002," the quarterly and annual filings "fully compl[y] with the requirements of

Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934," and that the "information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Lakeland."

27. Each of the Individual Defendants, because of their positions with Lakeland, possessed the power and authority to control the contents of Lakeland's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of Lakeland's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

28. Lakeland is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

29. The scienter of the Individual Defendants and other employees and agents of Lakeland is similarly imputed to the Company under *respondeat superior* and agency principles.

30. The Company and the Individual Defendants are referred to herein, collectively, as "Defendants."

## IV. SUBSTANTIVE ALLEGATIONS

### A. Background

31. According to its annual report for the fiscal year ended January 31, 2025 ("2025 10-K), filed on April 17, 2025, Lakeland, which does business as "Lakeland Fire + Safety," is a global manufacturer and seller of personal protective equipment ("PPE"), including firefighter protective apparel, helmets, gloves, boots, chemical protective suits, disposable garments, flame-resistant apparel, and related safety products for industrial workers and first responders worldwide. The Company represents that it sells these products through its direct sales force and authorized distributors to customers in the chemical, petrochemical, energy, pharmaceutical, utility, manufacturing, healthcare, military, and fire-service markets.

32. According to its 2025 10-K, beginning in 2023, Lakeland emphasized a strategy of transforming itself from a traditional industrial PPE manufacturer into a comprehensive global fire-services company offering firefighters "head-to-toe" protection, including turnout gear, helmets, boots, gloves, hoods, and related services.

33. Throughout the Class Period, Lakeland described its acquisition program as its "SSQ," Small, Strategic and Quick, M&A strategy, under which the Company sought to acquire niche businesses that could be integrated rapidly to expand its product portfolio, geographic footprint, manufacturing capabilities, and profitability. During quarterly earnings releases and investor presentations, Defendant Jim Jenkins referred to the Company's execution of its SSQ acquisition strategy as a principal driver of growth.

34. Lakeland funded these acquisitions with cash, either its own or borrowed from Lakeland's revolving credit facility. For example, on November 30, 2023, Lakeland purchased Pacific Helmets NZ Limited in an all-cash transaction valued at approximately $6.3 million, paid for with cash on hand and borrowing from Lakeland's revolving credit facility. On February 4,

2024, Lakeland acquired Jolly Scarpe S.p.A. and Jolly Scarpe Romania S.R.L. for approximately $9, million, paid for primarily with money borrowed from Lakeland's revolving credit facility. On July 1, 2024, Lakeland acquired LHD Group Deutschland GmbH for approximately $14.8 million in cash, with most of the purchase price going to pay down LHD's debt. Finally, on December 16, 2024, Lakeland acquired Veridian Limited for $25 million in cash, with the entire purchase funded through borrowing from Lakeland's revolving credit facility.

**B. FE-1 Informed Defendants Directly That Lakeland's Consolidated Results Were Materially False for Failing to Eliminate Intercompany Transactions, but Rather Than Restating and Correcting, Defendants Demanded That FE-1 Falsify the Regional Numbers**

35. Former Employee Number 1 ("FE-1") worked as the Director of Global Sales Operations at Lakeland from July 2023 until August 2025. Prior to that FE-1 worked as a Sales & Marketing Operations Manager going back to March 2021. FE-1 reported to the Vice President of Global Marketing, Brian Shockley. Shockley reported to the Chief Revenue Officer, Barry Phillips. FE-1 was based out of the Huntsville, Alabama office of Lakeland where the Company is headquartered.[3]

36. As the Director of Global Sales Operations, FE-1 was responsible for reconciling Lakeland's global sales data.

37. FE-1 discovered that Lakeland's global sales data at the entity level did not match Lakeland's consolidated financial results.

38. According to FE-1, transactional information from Lakeland's regions and operating entities did not support the published financials. According to FE-1, what Lakeland's

[3] FE-1 has requested that Lead Counsel not plead his name in this Complaint. However, that does not mean FE-1's identify is concealed from Defendants, who can identify FE-1 from the description provided.

segments reported as their transactional information did not support the accounts that Lakeland reported on its consolidated statements of operation. That is, according to FE-1, Defendants and their finance function were failing, at the corporate level, to eliminate intercompany sales thereby failing to consolidate accounts according to GAAP. As a direct result, Lakeland disclosed materially false financial statements.

39. As an example, FE-1 recalls that Defendants and Lakeland's corporate finance function inflated consolidated revenue by failing to eliminate intercompany transactions from operations in China. Indeed, he recalls that for years Lakeland's Chinese operations included intercompany transactions in their results. In his review of global sales for purposes of reconciliation, FE-1 discovered that the Chinese region had reported $1.5 million or more of intercompany transactions in just a one-year period that Defendants and the corporate finance function failed to eliminate, counting intercompany transactions as revenue in Lakeland's consolidated results.

40. In September or October 2024, FE-1 began reporting his findings to his manager. Defendants did not respond, so in December 2024, FE-1 spoke directly with Defendant Phillips and Vice President of Global Marketing Brian Shockley, explaining his findings and alerting them that Lakeland had falsified consolidated results by failing to eliminate intercompany accounts. FE-1 also directly told Defendants Jenkins, Shannon, and An about Lakeland's failure to eliminate intercompany accounts and its material impact on its consolidated results.

41. Rather than taking action or even investigating FE-1's evidence and conclusions, Defendants, themselves, affirmatively chose to perpetuate the fraud. According to FE-1, Defendants Jenkins told him directly to alter the numbers he had reconciled from the regions so that they matched the consolidated numbers Defendants had reported publicly. FE-1 spoke with

Defendant Phillips, and flatly refused to falsify numbers. Defendant Jenkins then insisted that FE-1 match the regional sales data to the consolidated results. Again, FE-1 refused, conveying that he would not lie.

42. According to FE-1, Lakeland wanted to falsify the numbers because they had a big investor coming in to invest in Lakeland. In fact, Lakeland itself corroborates FE-1's assertion about this investor. According to a February 7, 2025, Form 13G filed with the SEC, during the period when FE-1 was reporting the fraud to Defendants and being told to ignore the fraud and do what he was told to do, Wasatch Advisors LP increased its holdings to own 10.9% of Lakeland. That position was accumulated in late 2024 and/or January 2025.

### C. Lakeland Fires its Auditor Deloitte & Touche Just After the Whistleblower Confronts Defendants About Their Fraudulent Scheme

43. Deloitte & Touche LLP ("Deloitte") had served as Lakeland's independent registered public accounting firm since 2020.

44. A Proxy Statement on Form 14A, filed with the SEC on May 10, 2024, included a shareholder proposal to affirm Lakeland's Audit Committee's selection of Deloitte as the Company's independent auditor for the fiscal year ended January 31, 2025. About that proposal the Proxy stated:

> Our Audit Committee has selected Deloitte & Touche LLP ("Deloitte") as our independent registered public accounting firm to audit our consolidated financial statements for the fiscal year ending January 31, 2025 and has directed that management submit the selection of Deloitte as our independent registered public accounting firm for ratification by the stockholders at the Annual Meeting. A representative of Deloitte is expected to be available at the Annual Meeting and will be available to respond to appropriate questions from our stockholders and will be given an opportunity to make a statement if he or she desires to do so.
>
> Neither our Bylaws nor other governing documents or applicable law require stockholder ratification of the selection of Deloitte as our independent registered public accounting firm. However, the Audit Committee seeks to have the selection of Deloitte ratified as a matter of good corporate governance. If the stockholders fail to ratify the selection, the Audit Committee will reconsider whether to retain

> that firm. Even if the selection is ratified, the Audit Committee may in its discretion direct the appointment of different independent registered public accountants at any time during the year if they determine that such a change would be in the best interests of the Company and its stockholders.

45. On June 13, 2024, Lakeland's shareholders voted overwhelmingly to ratify the selection of Deloitte to serve as the Company's auditor for the fiscal year ending January 31, 2025.

46. Not five months later, on October 11, 2024, however, well before the audit of fiscal year 2025, and a few months before the end of fiscal year 2025, Lakeland dismissed Deloitte without any explanation to shareholders (as would typically be the case when replacing an auditor for good reason, such as reduced fees), "effective immediately." It is rare for a publicly traded company to dismiss its independent auditor "effective immediately" and extraordinarily suspicious under the circumstances in this case.

47. Furthermore, dismissals of an auditor before the auditor has completed its year-end audit (as is the case here) is a red-flag for fraud. According to an academic paper titled "Opaque auditor dismissal disclosures: What does timing reveal that disclosures do not?" published in the *Journal of Accounting and Public Policy* in February 2022:

> We find evidence that casts suspicion on client motives when dismissals occur outside of the 30-day period following the 10-K filing date. This 30-day period is the most common time of the year to dismiss auditors, and we find that clients that dismiss auditors within this 30-day period have rates of future restatements and material weaknesses that are in line with those of control firms that retain their auditors. In contrast, ***we find that future revelations of restatements and material weaknesses become more likely for clients that dismiss auditors after this 30-day period ends***.

48. Lakeland replaced Deloitte with RSM US LLP ("RSM"), which is not among the top tier U.S. auditing firms like Deloitte. According to the Public Company Accounting Oversight Board (the "PCAOB") report titled "2024 Inspection RSM US LLP" dated May 22, 2025, RSM had an audit deficiency rate of 41% in 2024 on audits examined by the PCAOB. According to the

PCAOB report titled "2024 Inspection Deloitte & Touche LLP" dated February 26, 2025, Deloitte had an audit deficiency rate of only 14% on the audits examined by the PCAOB.

49. Lakeland fired Deloitte around the time that FE-1 was blowing the whistle on Defendants' scheme to artificially inflate the Company's reported financial results. The timing is striking.

### D. Defendants' Fraud Rendered Lakeland's Financial Statements Materially Misleading

#### 1. Relevant General Accounting Principles

50. GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. The SEC Rules and interpretive releases and the Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") represent sources of authoritative GAAP for SEC registrants. In addition, the SEC issues Staff Accounting Bulletins, which represent practices followed by the SEC staff in administering SEC disclosure requirements. ASC 105-10-05-1. FASB updates the ASC by issuing Accounting Standards Updates ("ASUs") that communicate changes to the Codification.

51. If the guidance for a transaction or event is not specified within a source of authoritative GAAP, an entity should first consider accounting principles for similar transactions or events within a source of authoritative GAAP and then consider nonauthoritative guidance from other sources, such as practices that are widely recognized and prevalent either generally or in the industry, FASB concepts statements, American Institute of Certified Public Accountants ("AICPA") issues papers, professional associations' or regulatory agencies' pronouncements, and others. ASC 105-10-05-2 – 05-3.

52. Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires interim financial statements to also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

53. According to the FASB's conceptual framework for financial reporting, Statement of Financial Accounting Concepts No. 8, ("CON 8"), Ch. 3, "[i]f financial information is to be useful, it must be relevant and faithfully represent what it purports to represent. The usefulness of financial information is enhanced if it is comparable, verifiable, timely, and understandable." (emphasis added). CON 8, Ch. 5, further states that "[f]aithful representation … is a fundamental qualitative characteristic. To be useful, financial information not only must represent relevant phenomena, but it also must faithfully represent the phenomena that it purports to represent. Financial information that is faithfully represented must be complete, neutral, and free from error."

54. Disclosures in the notes to financial statements supplement, explain or amplify the information presented in the financial statements. CON 8, Ch. 8, D4 and D7. "[S]ome useful information is better provided by financial statements and some is better provided, or can only be provided, by notes to financial statements or by supplementary information or other means of financial reporting." CON 8, Ch. 8, D5.

55. "Information about the accounting policies adopted by an entity is essential for financial statement users." ASC 235-10-50-1. GAAP therefore requires disclosure of all significant accounting policies (accounting policies broadly include accounting principles, methods and techniques). An accounting policy is significant if it has a material impact, either quantitatively or

qualitatively, on the financial statements presented. ASC 235-10-05 and ASC 235-10-50. Unusual or innovative applications of GAAP must be disclosed. ASC 235-10-50-3.

**2. Materiality**

56. FASB's Statements of Financial Accounting Concepts provide the framework for financial accounting, including the concept of materiality. As stated in FASB's Statement of Financial Accounting Concepts No. 8 ("CON 8"), the "objective of general purpose financial reporting is to provide financial information about the reporting entity that is useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to the entity" CON 8 ¶ OB2. A primary quality that renders financial information useful is faithful representation. For an entity to faithfully represent what it purports to represent, information must be complete, neutral, and free from error. CON 8 ¶ QC12. CON 8 further explains that materiality is entity specific: "The omission or misstatement of an item in a financial report is material if, in light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item." CON 8 ¶ QC11.

57. Further guidance on materiality is provided by SEC Staff Accounting Bulletin ("SAB") Topics 1.M, generally referred to as SAB No. 99, which offers the most comprehensive guidance on the determination of materiality of misstatements of financial statements. It brings together guidance from financial accounting standards, auditing standards, and decisions of the United States Supreme Court. SAB 99 addresses misstatements or omission of amounts, classifications, manner of presentation and disclosures in financial statements. It provides that the materiality assessment must be based on consideration of all relevant circumstances--the "total mix" of information, including the size of the misstatement and the context in which the user of the financial statements would view the item. It also sets forth the SEC Staff's view that there are

circumstances in which misstatements below a percentage threshold (e.g., 5 percent) could be material.

58. According to SAB 99, a misstatement may be material if it "hides a failure to meet analysts' consensus expectations for the enterprise," involves a significant segment or a component of the enterprise, or "has the effect of increasing management's compensation." "The shorthand in the accounting and auditing literature for this analysis is that financial management and the auditor must consider both 'quantitative' and 'qualitative' factors in assessing an item's materiality."

59. In summary, the evaluation of whether a misstatement or omission in financial statements is material is viewed from the standpoint of a reasonable investor and the likelihood that a misstatement or omission would have significantly altered decisions of the investor, considering the circumstances, including both quantitative and qualitative factors, and the nature of the item and its location within the financial statements.

**3. Elimination of Intercompany Transactions**

60. GAAP provision ASC 810, Consolidation, requires companies to eliminate intercompany transactions in consolidation:

> In the preparation of consolidated financial statements, intra-entity balances and transactions shall be eliminated. This includes intra-entity open account balances, security holdings, sales and purchases, interest, dividends, and so forth. As consolidated financial statements are based on the assumption that they represent the financial position and operating results of a single economic entity, such statements shall not include gain or loss on transactions among the entities in the consolidated group. Accordingly, any intra-entity profit or loss on assets remaining within the consolidated group shall be eliminated; the concept usually applied for this purpose is gross profit or loss … .

ASC 810-10-45-1

**4. Segment Reporting Requirements**

61. ASC 280, Segment Reporting, requires disclosures about a public company's segments and the different economic environments in which it operates to help users of financial

statements (a) better understand the public entity's performance, (b) better assess its prospects for future net cash flows, and (c) make more informed judgments about the public entity as a whole. ASC 280-10-10-1.

62. ASC 280 also requires a public entity to "report the revenues from external customers for each product and service or each group of similar products and services." ASC 280-10-50-40. "A public entity shall report the following geographic information …: Revenues from external customers attributed to the public entity's country of domicile and attributed to all foreign countries in total from which the public entity derives revenues. If revenues from external customers attributed to an individual foreign country are material, those revenues shall be disclosed separately. A public entity shall disclose the basis for attributing revenues from external customers to individual countries. … The amounts reported shall be based on the financial information that is used to produce the general-purpose financial statements." GAAP allows a public company to disclose subtotals of geographic information about groups of countries. ASC 280-10-50-41.

63. ASC 606, Revenue from Contracts with Customers, requires a public company to "disaggregate revenue recognized from contracts with customers into categories that depict how the nature, amount, timing, and uncertainty of revenue and cash flows are affected by economic factors." ASC 606-10-50-5. GAAP acknowledges that a public company may disaggregate revenue into more than one category, including by "[g]eographical region (for example, country or region). ASC 606-10-55-89 – 91. "In addition, an entity shall disclose sufficient information to enable users of financial statements to understand the relationship between the disclosure of disaggregated revenue … and revenue information that is disclosed for each reportable segment … ." ASC 606-10-50-6.

### 5. Defendant Jenkins' Direct Oversight of Segment Reporting

64. During the Class Period, Defendant Jenkins also served as Lakeland's Chief Operating Decision Maker ("CODM"), the executive responsible for evaluating the performance of Lakeland's operating segments and allocating resources among those segments. As CODM, Jenkins regularly received and reviewed internal segment-level financial information concerning Lakeland's operations.

65. In its 2025 10-K, Lakeland disclosed that Defendant Jenkins took personal responsibility for the Company's segment financial reporting and public disclosures, which would include the specific inter-Company transactions at issue in this case.

> The Company is organized into seven geographical operating segments that are based on management responsibilities: US Operations (including Corporate), Europe, Mexico, Asia, Canada, Latin America and Other Foreign.
>
> The Company adopted ASU No. 2023-07 ("ASU 2023-07"), Segment Reporting (Topic 280): Improvements to Reportable Segment Disclosures for the year ended January 31, 2025 and applied it retrospectively for the prior period presented.
>
> Gross profit and Operating profit are the measures used ***by the chief operating decision maker, identified as our President and Chief Executive Officer***, to evaluate segment performance and identify opportunities when allocating resources.
>
> The accounting principles applied at the reportable segment level in determining the segment measure of profit or loss are the same as those applied at the consolidated financial statement level. ***Sales and transfers between operating segments are accounted for at market-based transaction prices and are eliminated in consolidation***.

66. Defendant CEO Jenkins was the executive whose job was to review the Company's segment-level operating information. Jenkins would have a keen understanding of the impacts of the Company's intentional failure to properly eliminate inter-company sales transactions.

67. Accordingly, when Defendant CEO Jenkins personally instructed FE-1 to falsify the segment level financial data to match the corporate finance department's inflated financial

records, Defendant Jenkins knew the significance of his instructions and the impact it would have on the Company's public financial reporting to investors.

**6. The Scheme's Impact on Lakeland's Reported Financial Results**

68. Defendants' scheme overstated Lakeland's publicly reported consolidated financial results, specifically (i) sales (i.e., revenue), (ii) gross profit, (iii) pre-tax income, and (iv) inventory levels, and understated the costs of goods sold ("COGS").

69. Lakeland's Annual Report filed on Form 10-K with the SEC on April 17, 2025, stated in its "Summary of Significant Accounting Policies" under the sub-heading "Principles of Consolidation" the following with respect to the elimination of inter-Company transactions: "The accompanying consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries. ***All significant intercompany accounts and transactions have been eliminated.***" Substantially identical language appeared in the Company's Form 10-K filed with the SEC on April 11, 2024.

70. Similarly, Lakeland's Annual Report filed on Form 10-K with the SEC on April 17, 2025, stated with respect to segment reporting: "The accounting principles applied at the reportable segment level in determining the segment measure of profit or loss are the same as those applied at the consolidated financial statement level. ***Sales and transfers between operating segments are accounted for at market-based transaction prices and are eliminated in consolidation***."

71. Further, in both the September 6, 2024, second quarter 2025 10-Q, and in the December 10, 2024, third quarter 2025 10-Q, under "Basis of Presentation," Lakeland wrote that "These condensed financial statements include all adjustments, consisting of normal recurring adjustments, considered necessary by management to fairly state the Company's results. ***Intercompany accounts and transactions have been eliminated***."

72. These statements were false and misleading. As described in detail by FE-1, Lakeland failed to eliminate certain intercompany sales originating from the Asia segment in its consolidated financial statements. Defendants did this to inflate the Company's publicly reported financial results.

73. By failing to eliminate these intercompany transactions, consolidated sales would be overstated by the full amount of the intercompany sales that had not been eliminated.

74. To the extent that the goods sold through these transactions remained in ending inventory at period-end, the profit recognized by the Asia segment should not yet have been realized from the perspective of the consolidated entity – but Defendants did recognize these profits improperly. Accordingly, the consolidated financial statements overstated sales by the amount of the intercompany sales and thus overstated gross profit, pre-tax income, and ending inventory by the amount of the unrealized intercompany profit. Further, consolidated COGS was understated to the extent that unrealized profit remained embedded in ending inventory.

75. In addition to misstating the Company's consolidated financial statements, Lakeland's sales and cost of goods sold segment disclosures were misstated because uneliminated intersegment sales originating from the Asia segment were improperly reported as sales to external customers, which overstated the Asia segment's sales to external customers and total sales. Further, the failure to eliminate the intercompany sales understated the intersegment sales elimination line, overstated consolidated sales, and understated the intersegment COGS deduction to the extent unrealized intercompany profit remained embedded in ending inventory.

76. Throughout the Class Period, Lakeland emphasized in its earnings releases and conference calls for investors net sales, gross margins, net loss/income, earnings per share, and

adjusted EBITDA (excluding impacts of foreign exchange). All of these financial metrics were positively but falsely impacted by Defendants' fraudulent scheme as detailed by FE-1.

### E. Defendants Orchestrate an Equity Offering Leveraging Lakeland's Materially False Financial Results and Books and Disregarding the Whistleblower's Credible Allegations

77. Defendants were not growing Lakeland revenue organically. Rather, they engaged in SSQ to grow revenue through acquisition. Defendants paid for a material portion of those acquisitions from the Company's revolving credit line. Defendants floated the secondary offering in January 2025 to enhance the Company's cash position, and, in part, to repay $15 million of Lakeland's revolving credit line. In addition to enticing Wasatch to accumulate a 10.9% stake in the Company, Defendants were motivated to disclose financial statements they knew or recklessly disregarded were false to enable Lakeland to achieve a favorable price on the secondary offering, in turn, enabling it to continue growing revenue through acquisition.

78. On January 22, 2025, Lakeland issued a press release stating:

> Lakeland Industries, Inc. ("Lakeland Fire + Safety" or "Lakeland") (NASDAQ: LAKE), a leading global manufacturer of protective clothing for industry, healthcare, and first responders, today announced a proposed underwritten public offering of shares of its common stock. Lakeland also expects to grant to the underwriters of the offering a 45-day option to purchase up to an additional 15% of the shares of its common stock in the underwritten public offering on the same terms and conditions. All of the shares of common stock to be sold in the offering are to be sold by Lakeland.

79. On January 24, 2025, Lakeland issued a press release titled: "Lakeland Fire + Safety Announces Closing of Public Offering of Common Stock and Full Exercise of Underwriter's Option to Purchase Additional Shares." This was a secondary offering over $46 million (the "Secondary Offering"). The press release stated:

> Lakeland Industries, Inc. ("Lakeland Fire + Safety" or "Lakeland") (NASDAQ:LAKE), a leading global manufacturer of protective clothing for industry, healthcare, and first responders, today announced the closing of its previously announced underwritten public offering of an aggregate of 2,093,000

shares of its common stock at a price to the public of $22.00 per share, which includes the exercise in full by the underwriter of its option to purchase 273,000 additional shares of Lakeland's common stock. Gross proceeds to Lakeland, before deducting the underwriting discount and estimated offering expenses payable by Lakeland, were approximately $46.0 million.

80. About the Secondary Offering, Defendants wrote:

> We estimate that the net proceeds to us from the sale of shares of our common stock that we are offering will be approximately $37.0 million, after deducting the underwriting discounts and commissions and estimated offering expenses payable by us, ***or approximately $42.8 million if the underwriters exercise their over-allotment option to purchase additional shares in full***. We intend to use the net proceeds from this offering for (i) repayment of our outstanding revolving line of credit indebtedness first (to the extent required by our revolving credit facility) which was approximately $55.2 million as of January 21, 2025, (ii) working capital, (iii) capital expenditures, (iv) investments in our subsidiaries and (v) general corporate purposes. Under the terms of our revolving credit facility, we are required to first use the proceeds of the offering to pay down the indebtedness to $40,000,000. The indebtedness incurred under our revolving line of credit matures on December 12, 2029 and currently bears interest at the rate of 6.40% per annum; maximum borrowings thereunder are $60 million from December 12, 2024 through January 31, 2026 and $50 million from February 1, 2026 through January 31, 2027 (in each case, subject to reduction to no less than $40 million from the net proceeds of equity issuances if the Company raises capital during such periods).

81. Defendants further wrote:

> We will retain broad discretion over the use of the net proceeds from the sale of our securities offered by us hereby. Except as described in any prospectus supplement, we currently intend to use the net proceeds from the sale of securities offered by us pursuant to this prospectus for the repayment of existing indebtedness, working capital, capital expenditures, investments in our subsidiaries, and other general corporate purposes. We may also use such proceeds to fund acquisitions of businesses, technologies, or product lines that complement our current business.

82. The Secondary Offering was a material capital raise for Lakeland. Prior to the Secondary Offering, Lakeland had 7.406 million shares outstanding. On January 22, 2025, Lakeland’s stock traded at $25 and the Company had a market capitalization of approximately $185 million. The Secondary Offering was equivalent to approximately one-quarter of the Company’s market capitalization and 28% of the Company’s outstanding shares.

83. In connection with the Secondary Offering and sale of over 2 million shares of Lakeland stock, Defendants caused a false and misleading prospectus supplement dated January 22, 2025 and final prospectus dated January 24, 2025, to be filed with the SEC.

84. The Secondary Offering prospectus supplement and final prospectus incorporated by reference Lakeland's false and misleading financial statements and Defendants' certifications to the accuracy of those financial statements (and certifying that they were aware of no fraud at the Company) as reported in the Company's Quarterly Reports on Form 10-Q for the fiscal quarters ended July 31, 2024, and October 31, 2024, as detailed herein.

85. At no time did Lakeland or the Individual Defendants warn any of the investors in Lakeland stock, including investors in the Secondary Offering, that the Company and its senior management had been expressly told that the Company's financial statements – and any projections based on those financial statements – were inaccurate.

### F. Defendants Fire the Whistleblower for Refusing to Cook the Books

86. In July 2025, Lakeland fired FE-1 because he refused to align the individual Lakeland entity sales numbers with the Finance Department's sales numbers as ordered to by Defendant CEO Jenkins.

## V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS

87. On September 4, 2024, Lakeland announced financial results for its fiscal 2025 second quarter ended July 31, 2024, reporting: "Net sales of $38.5 million, up $5.4 million, or 16.5%, year-over-year," "Net loss of ($1.4 million) or ($0.19) per basic common share," and "Adjusted earnings before interest, taxes, depreciation, amortization and excluding FX (Adjusted EBITDA excluding FX) of $2.7 million in Q2-FY25." (footnote omitted).

88. The press release also reported inventories of $67.9 million, COGS of $23.3 million, and gross profit of $15.2 million.

89. Lakeland's reported financial statements in the September 4, 2024, press release were false and misleading as detailed herein. Defendants concealed from investors Lakeland's true financial condition by, among other things, recording as revenue intercompany transactions that GAAP required the Company to eliminate in consolidation. In turn, Defendants' manipulation of both the Asia segments results, artificially inflated the Company's consolidated reported revenues, earnings, gross profit, pre-tax income, adjusted EBITDA, and inventory levels, and understating COGS, while likewise falsifying the Asia segment financials.

90. Also on September 4, 2024, Lakeland hosted an earnings conference call in which Defendants Jenkins and Shannon repeated the Company's financial metrics (earnings, EBITDA, and revenues), which were false and misleading for the same reasons as previously articulated with respect to the Company's September 4, 2024, press release.

91. On September 6, 2024, Lakeland filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q2 ended July 31, 2024 (the "Q2 2025 10-Q"). That filing contained the same financial results reported in the Company's September 4, 2024, press release, which were false and misleading for the same reasons.

92. The Q2 2025 10-Q falsely reported that Lakeland's Asia segment recorded net sales of $13.5 million and an operating profit of $2.1 million. According to FE-1, the Asia segment's net sales and operating profit did not match the consolidated numbers because, in violation of GAAP, Defendants and Lakeland's finance function knowingly or recklessly failed to eliminate intercompany transactions as they falsely disclosed they did.

93. In the Q2 2025 10-Q, in "Basis of Presentation," Lakeland wrote that "These condensed financial statements include all adjustments, consisting of normal recurring

adjustments, considered necessary by management to fairly state the Company's results. ***Intercompany accounts and transactions have been eliminated***."

94. The foregoing statement was materially misleading, because, in violation of GAAP and its own accounting policies, Defendants knowingly or recklessly failed to eliminate intercompany transactions in its consolidated financial statements, overstating the Company's sales (i.e., revenue), gross profit, pre-tax income, and inventory levels, and understating COGS.

95. Appended as exhibits to the Q2 2025 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Jenkins and Shannon certified that the Q2 2025 10-Q "does not contain any untrue statements of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

96. Further, Defendants Jenkins and Shannon certified "the financial statements and other financial information included in this report fairly present, in all material respects, the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

97. Defendants Jenkins and Shannon also certified as follows:

> The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):
>
> a. ***All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting*** which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> b. ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting***.

98. Defendants Jenkins' and Shannon's certifications were false and misleading, as Defendants Jenkins and Shannon knew and/or recklessly disregarded that Lakeland's global sales data had been fraudulently inflated for years prior to September 2024. Lakeland was improperly counting intercompany transactions such that the global sales data did not match with what the finance department was reporting publicly. As detailed above, when FE-1 reported this directly to Lakeland's senior management beginning in September or October 2024. Defendant Jenkins then told FE-1 to falsify the numbers, which he refused to do as he refused to lie. Accordingly, it was false and misleading for Defendants to certify that the financial statements were free of fraud and that they had reported "any fraud, whether or not material" to the Company's auditors and Audit Committee.

99. On December 5, 2024, Lakeland announced financial results for its fiscal 2025 third quarter ended October 31, 2024, reporting (i) "Net sales were a record $45.8 million for the third quarter of fiscal 2025, an increase of $14.1 million or 44.5% compared to $31.7 million for the third quarter of fiscal 2024, driven by an increase in Fire Services." (ii) "Gross profit for the third quarter of fiscal 2025 was $18.6 million, an increase of $5.2 million, or 38.9%, compared to $13.4 million for the third quarter of fiscal 2024." (iii) "Adjusted EBITDA excluding FX for the third quarter of fiscal year 2025 was $4.7 million, an increase of $0.2 million, or 4.9%, compared with $4.5 million for the third quarter of fiscal 2024. (footnote omitted) and (iv) "Asia revenue was $3.6 million for the third quarter of fiscal 2025, an increase of $0.5 million or 15.5% compared to $3.1 million for the third quarter of fiscal 2024."

100. The press release also reported net income of $0.1 million, inventories of $72.7 million, COGS of $27.2 million, and gross profit of $18.6 million.

101. Lakeland's reported financial statements in the December 5, 2024, press release were false and misleading as detailed above. Defendants concealed from investors Lakeland's true financial condition by, among other things, recording as revenue intercompany transactions that artificially inflated the Company's reported revenues, earnings, gross profit, pre-tax income, adjusted EBITDA, and inventory levels, and understating COGS, resulting from their knowing or reckless refusal to eliminate intercompany accounts in at least the Asia segment.

102. Also on December 5, 2024, Lakeland hosted an analyst conference call in which Defendants Jenkins and Shannon repeated the Company's financial metrics (earnings, EBITDA, and revenues), which were false and misleading for the same reasons as previously articulated with respect to the Company's December 5, 2024, press release.

103. Further, during the December 5, 2024, conference call Defendant Shannon falsely described the reason for the Company's increased adjusted EBITDA without disclosing that this sales growth was driving by Lakeland's finance department's failure, at the corporate level, to eliminate intercompany sales in consolidation, in violation of GAAP. He said:

> Adjusted EBITDA excluding FX for the third quarter of fiscal year 2025 was $4.7 million an increase of $.2 million or 4.9% compared to $4.5 million for the third quarter of fiscal 2024. The increase in adjusted EBITDA excluding FX was driven primarily by margin improvement in our organic sales mix and contributions from Jolly and LHD, partially offset by higher SG&A expenses.

104. During the December 5, 2024, conference call, Defendant Shannon also misleading described the Company's reported double-digit sales growth in its Asia segment without disclosing that this sales growth was driving by accounting practices in the China division that violated GAAP. He stated:

> We also saw double-digit sales growth year-over-year in Asia. We're very excited about the new sales leadership that we've put in place in Asia and we are encouraged by the growth we're seeing in both China and new Asian markets outside of China.

105. Defendant Shannon's attribution of increased adjusted EBIDTA to margin improvement, without disclosing that Lakeland had improperly recorded intercompany transactions to inflate the reported revenues and earnings (including adjusted EBITDA) artificially rendered his statements false and misleading. Defendant Shannon's assertion that Asia was growing sales by double-digit percentages was misleading because it failed to disclose that, in violation of GAAP and Lakeland's own stated accounting principles, Defendants and the corporate financial function knowingly or recklessly failed to eliminate intercompany transactions, artificially and materially inflating consolidated sales.

106. On December 10, 2024, Lakeland filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q3 ended October 31, 2024 (the "Q3 2025 10-Q"). That filing contained the same financial results reported in the Company's December 5, 2024, press release, which were false and misleading for the same reasons.

107. The Q3 2025 10-Q falsely reported that Lakeland's Asia segment recorded net sales of $14.6 million and an operating profit of $3.4 million. The Asia segment's operating profit was the largest of any reporting segment. According to FE-1, the Asia segment's net sales and operating profit did not match the consolidated numbers and Defendants insisted that the Asia segment's numbers be changed to match the materially false consolidated numbers rather than eliminating intercompany accounts as they publicly disclosed they did.

108. In the Q3 2025 10-Q, under "Basis of Presentation," Lakeland wrote that "These condensed financial statements include all adjustments, consisting of normal recurring adjustments, considered necessary by management to fairly state the Company's results. ***Intercompany accounts and transactions have been eliminated***."

109. The foregoing statement was materially misleading, because, in violation of GAAP and its own accounting policies, Defendants knowingly or recklessly failed to eliminate intercompany transactions in its consolidated financial statements, overstating the Company's sales (i.e., revenue), gross profit, pre-tax income, and inventory levels, and understating COGS.

110. Appended as exhibits to the Q3 2025 10-Q were signed SOX certifications substantially identical to the SOX certifications appended to the Q2 2025 10-Q.

111. Defendants Jenkins' and Shannon's certifications were false and misleading, as Defendants Jenkins and Shannon knew and/or recklessly disregarded that Lakeland's global sales data had been fraudulently inflated for years prior to December 2024. Lakeland was improperly counting intercompany transactions such that the global sales data did not match what the finance department was reporting publicly. As detailed above, when FE-1 reported this to Lakeland's senior management team beginning in September or October 2024, those same Lakeland senior management (including Defendants) told FE-1 to falsify the numbers, which he refused to do as he believed it to be lying. Accordingly, it was false and misleading for Defendants to certify that the financial statements were free of fraud and that they had reported "any fraud, whether or not material" to the Company's auditors and Board of Directors audit committee.

112. On January 22, 2025, Lakeland filed with the SEC the Company's Prospectus Supplement for the Secondary Offering for the sale of 1.82 million shares, and an additional 273,000 shares at the option of the Underwriters in the Offering.

113. The Secondary Offering Prospectus Supplement incorporated by reference Lakeland's false and misleading financial statements and Defendants' certifications to the accuracy of those financial statements (and certifying that they were aware of no fraud at the Company) as

reported in the Company's Quarterly Reports on Form 10-Q for the fiscal quarters ended July 31, 2024, and October 31, 2024, as detailed herein.

114. On January 24, 2025, Lakeland filed with the SEC the Company's Final Prospectus Supplement for the Secondary Offering for the sale of 1.82 million shares, and an additional 273,000 shares at the option of the Underwriters in the Offering.

115. The Secondary Offering Final Prospectus incorporated by reference Lakeland's false and misleading financial statements and Defendants' certifications to the accuracy of those financial statements (and certifying that they were aware of no fraud at the Company) as reported in the Company's Quarterly Reports on Form 10-Q for the fiscal quarters ended July 31, 2024 and October 31, 2024, as detailed herein.

116. Both the Prospectus Supplement and Final Prospectus were made pursuant to a S-3 Registration Statement filed by Lakeland with the SEC on July 12, 2024 (effective July 18, 2024) that was signed by Defendants Jenkins and Shannon.

117. Both the Prospectus Supplement and Final Prospectus were recklessly or knowingly false. In the context of years of failing to eliminate intercompany sales in consolidation, despite explicitly telling investors they had, Defendants were duty-bound to tell investors that Defendants had failed to eliminate intercompany sales in consolidation, that therefore the financial results were false as stated, and that Defendants' expressed optimism was based on those false financial statements.

## VI. THE TRUTH BEGINS TO EMERGE

118. Defendants, as alleged herein, directly and proximately caused Plaintiffs' and Class members' economic loss. During the Class Period, Defendants engaged in a wrongful course of business conduct that was designed to conceal from investors Lakeland's true financial condition by, among other things, recording as revenue intercompany transactions that artificially inflated

the Company's reported revenues, earnings, gross profit, pre-tax income, adjusted EBITDA, and inventory levels, and understating COGS, while likewise falsifying the Asia segment financials, as detailed herein. As a result, Lakeland's shares traded at artificially inflated prices as a direct result of Defendants' materially false and misleading statements, and concealment of the relevant truth about Defendants' fraudulent scheme. In doing so, Defendants were able to sell 2.093 million Lakeland shares to investors at $22, raising $46.0 million for the Company. Plaintiffs and other Class members purchased Lakeland stock at artificially inflated prices and suffered damages when Lakeland's stock price declined as the relevant truth about the Company's true financial condition entered the market.

119. When the truth concerning Lakeland's actual financial condition began to be revealed on April 9, 2025, and afterwards, Defendants did not admit that they had previously manipulated the Company's financial results, that they had intimidated the whistleblower to withdraw his allegations of fraudulent wrongdoing, to cover up those allegations, and that they had fired FE-1. Rather, Defendants continued to assert that no wrongdoing had occurred.

120. Defendants, however, could not continue to falsify the Company's financial results indefinitely to hide the difference between the Company's actual financial condition and what was portrayed to investors publicly. Ultimately, the Company would report progressively worse financial metrics to Lakeland's investors as the gap between the fiction and reality widened.

121. Investors began to question the veracity of Defendants' prior public statements after the market closed on April 9, 2025, when Lakeland announced financial results for its fiscal 2025 fourth quarter and full year 2025 ended January 31, 2025. These financial results were the first audited financial results published by Lakeland since FE-1 had discovered the Company's fraud and reported it to the Company's senior executives including Defendants Jenkins and Shannon.

122. The April 9, 2025, press release ***partially*** revealed Lakeland's true financial condition was not nearly as good as Defendants had previously misrepresented to investors. Lakeland reported a Q4 2025 GAAP net loss of $18.4 million, EPS of -$2.42 (a $2.71 miss versus the analyst consensus estimate of $0.29), and an adjusted EBITDA of $5.1 million (a $3 million miss versus the Company's implied guidance of $8.1 million, and a $2 million miss versus the analyst consensus estimate of $7.1 million).

123. Only a few months prior, on December 9, 2024, Defendants had once again reassured investors: "Given the totality of our positive results, trends and expectations, ***we continue to expect*** fiscal year revenue of at least $165 million and Adjusted EBITDA excluding FX of ***at least*** $18 million. . . ." In actuality, for the fiscal 2025 full year, Lakeland reported an adjusted EBITDA excluding FX of only $17.4 million – significantly below Defendants' repeatedly reiterated guidance of EBITDA of at least $18 million.

124. By failing to eliminate intercompany transactions, Defendants' prior false and misleading statements during the Class Period had falsely portrayed Lakeland's earning capabilities as greater than actuality. Analysts and investors had relied upon Lakeland's prior false financial results when building models and expectations of the Company's earnings capabilities going forward. When Lakeland ultimately reported financial results on April 9, 2025, those results were far below what analysts and investors expected based on their analysis of the Company and relying upon Defendants' prior false representations.

125. Though Defendants had fraudulently inflated the Company's reported financial results during the Class Period, the true financial condition of Lakeland had been partially revealed to investors with these disclosures. Investors and analysts reacted immediately to Lakeland's revelation. The price of Lakeland shares declined dramatically. From a closing market price of

$18.35 per share on April 9, 2025, Lakeland's stock price fell to a close of $15.72 per share on April 10, 2025, a decline of over 14%.

126. However, Defendants did not admit to having committed fraud. Investors continued to be misled as to the Company's true financial condition and Defendants continued to cover-up that Lakeland had reported, and continued to report, false and misleading financial results, as detailed herein. Indeed, FE-1 expressly indicated that Defendants continued to pressure FE-1 to falsify financial information up through their firing him in July 2025 for refusing to participate in the Defendants' fraudulent scheme.

127. Moreover, on April 17, 2025, Lakeland filed its annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for its full year ended January 31, 2025 (the "2025 10-K"). That filing contained the same financial results reported in the Company's April 9, 2025 press release, which were false and misleading for the same reasons. Specifically, the 2025 10-K included the Company's financial results for the full year 2025. According to FE-1, throughout 2025 Lakeland's finance function repeatedly failed to eliminate intercompany sales thereby falsely reporting inflated revenues, earnings, gross profit, pre-tax income, adjusted EBITDA, and inventory levels, and understating COGS. Because of Defendants' direct intervention, matching segment revenues to consolidated, they also disclosed materially false financials for the Asia segment.

128. Appended as exhibits to the 2025 10-K were signed SOX certifications substantially identical to the SOX certifications appended to the Q2 2025 10-Q. Defendants' SOX certifications were false and misleading as Defendants Jenkins and Shannon knew and/or recklessly disregarded that Lakeland's global sales data had been fraudulently inflated for years prior to April 2025. Lakeland was improperly counting intercompany transactions such that the

global sales data did not match what the finance department was reporting publicly. As detailed above, when FE-1 reported this to Lakeland's senior management team beginning in September or October 2024, those same Lakeland senior management (including Defendants) told FE-1 to falsify the numbers, which he refused to do as he believed it to be lying. Accordingly, it was false and misleading for Defendants to certify that the financial statements were free of fraud and that they had reported "any fraud, whether or not material" to the Company's auditors and Board of Directors audit committee.

129. Accordingly, much of the artificial inflation in Lakeland's stock price resulting from Defendants' fraudulent scheme remained in the stock because investors were not fully aware of Defendants' conduct or the Company's true financial condition.

130. Further, Defendants continued to falsely tell investors that it was properly accounting for intercompany sales, telling investors in the 2025 10-K that ***"Sales and transfers between operating segments are accounted for at market-based transaction prices and are eliminated in consolidation."***

131. The foregoing statement was materially misleading, because, in violation of GAAP and its own accounting policies, Defendants knowingly or recklessly failed to eliminate intercompany transactions in its consolidated financial statements, overstating the Company's sales (i.e., revenue), gross profit, pre-tax income, and inventory levels, and understating COGS.

132. Investors again had cause to question the veracity of Defendants' prior public statements when, after the market closed on June 9, 2025, Lakeland announced financial results for its fiscal 2026 first quarter

133. The June 9, 2025, press release ***partially*** revealed Lakeland's true financial condition was materially worse than Defendants had previously misrepresented to investors.

134. The Company's financial metrics were materially worse than expected. Lakeland reported a Q1 2026 GAAP net income loss of $3.9 million, EPS of -$0.41 (a $0.63 miss versus the analyst consensus estimate of $0.22), an adjusted EBITDA of -$0.7 million (a $7.5 million miss versus the consensus estimate of $6.8 million), and revenue of $46.7 million (a $2.2 million miss versus a consensus estimate of $48.9 million).

135. By failing to eliminate intercompany transactions, Defendants' prior false and misleading statements during the Class Period had portrayed Lakeland's earning capabilities as greater than actuality. Analysts and investors had relied upon Lakeland's prior false financial results when building models and expectations of the Company's earnings capabilities going forward. When Lakeland reported financial results on June 9, 2025, those results were far below what analysts and investors expected based on their analysis of the Company and relying upon Defendants' prior false representations.

136. Though Defendants had fraudulently inflated the Company's reported financial results during the Class Period, the true financial condition of Lakeland had been partially revealed to investors with these disclosures. Investors and analysts reacted immediately to Lakeland's revelation. The price of Lakeland shares declined dramatically. From a closing market price of $19.36 per share on June 9, 2025, Lakeland's stock price fell to a close of $15.07 per share on June 10, 2025, a decline of 22%.

137. Defendants, however, continued to mislead as to the Company's true financial condition, as indicated in the analyst report issued by DA Davidson on June 10, 2025, which stated:

> We are maintaining our BUY rating and $23 price target on LAKE following F1Q:26 earnings. F1Q EBITDA was short of expectations, with much of it coming from accounting-related issues that will reverse themselves within FY:26; full-year guidance was not changed. Delayed orders (with high confidence they will be filled in F2Q-F4Q) and elevated SG&A costs rounded out the miss. Net-net, while we are reducing FY:26 EBITDA slightly, this is nowhere near the ~20% decline the stock

> has seen to start the day. After talking with management about the above 1Q issues, we would be buyers on today's decline.

138. Further, Defendants continued to falsely tell investors that it was properly accounting for intercompany sales, telling investors in the June 9, 2025, first quarter 2026 10-Q that *"**Sales and transfers between operating segments are accounted for at market-based transaction prices and are eliminated in consolidation.**"*

139. The foregoing statement was materially misleading, because, in violation of GAAP and its own accounting policies, Defendants knowingly or recklessly failed to eliminate intercompany transactions in its consolidated financial statements, overstating the Company's sales (i.e., revenue), gross profit, pre-tax income, and inventory levels, and understating COGS.

140. Defendants, however, could not continue to maintain the fraudulent scheme indefinitely and were forced to report disappointing financial results in December 2025. After market close on the last day of the Class Period, December 9, 2025, Lakeland issued a press release reporting its financial results for Q3 of its FY 2026 for the quarter ended October 31, 2025. Lakeland reported a Q3 2026 GAAP net loss of $16.0 million, EPS of -$1.64 (a $1.87 miss versus the consensus estimate of $0.23), an adjusted EBITDA of -$0.7 million (a $7.5 million miss versus the consensus estimate of $6.8 million) and revenue of $47.6 million (a $9.1 million miss versus the consensus estimate of $56.7 million). These were huge misses versus the consensus estimates that management had guided to.

141. The press release further revealed that Lakeland was withdrawing its previously issued financial guidance for FY 2026 and would not provide financial guidance going forward.

142. The same day, also during post-market hours, Lakeland filed a current report on Form 8-K with the SEC (the "Q3 2026 8-K"), disclosing: "On December 4, 2025, the Company

and [Defendant] Shannon ... mutually agreed that [Defendant] Shannon's employment will terminate effective December 31, 2025." Lakeland had effectively fired its CFO.

143. Though Defendants' fraud, inflating the Company's reported financial results during the Class Period, had hidden Lakeland's true financial condition, the disclosures revealed Lakeland's true financial condition to investors. Investors and analysts reacted immediately to Lakeland's revelation. The price of Lakeland shares declined dramatically. From a closing market price of $15.01 per share on December 9, 2025, Lakeland's stock price fell to a close of $9.16 per share on December 10, 2025, a decline of 39%.

144. DA Davidson issued a research report on December 10, 2025, immediately after the press release, connecting the Company's dismal financial results and management's lack of credibility to Lakeland's stock price decline.

> We are downgrading LAKE to NEUTRAL (from BUY) with a new price target of $14 (from $20) following F3Q:26 earnings. ***In short, the company missed F3Q expectations substantially; withdrew guidance; suspended the dividend; terminated its CFO; and noted significant end-market uncertainties ahead***. There were some silver linings, such as expectations for high-single-digit revenue growth going forward as well as the effect of cost reductions--***but we believe LAKE has a lot of credibility to earn back before the stock can work again***. We are therefore stepping to the sidelines.

145. During the Class Period, Defendants had misrepresented the financial condition of Lakeland in order to sell its stock and is thus liable to Plaintiffs who relied upon the misinformation for the losses that they sustained when the facts as to the finances of the corporation become generally known, and as a result the value of Lakeland shares depreciated on the market. Such depreciation was the foreseeable result of the facts misrepresented.

146. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's shares, Plaintiffs and the other Class members have suffered significant losses and damages.

## VII. PLAINTIFFS' CLASS ACTION ALLEGATIONS

147. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Lakeland common stock publicly traded on the NASDAQ Global Market during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Lakeland, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

148. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Lakeland common stock were actively traded on the NASDAQ Global Market. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands, of members in the proposed Class.

149. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

150. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

151. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of Lakeland;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Defendants caused Lakeland to issue false and misleading filings during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false filings;
- whether the prices of Lakeland common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

152. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

153. In addition, common issues of fact and law predominate over individual issues. In particular, to avoid individual proof of reliance, Plaintiffs invoke, in part, the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Lakeland securities met the requirements for listing, and were listed and actively traded on the NASDAQ Global Market, an efficient market;

- As a public issuer, Lakeland filed public reports;
- Lakeland regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;
- Lakeland's securities were liquid and traded with moderate to heavy volume during the Class Period; and
- Lakeland was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

154. Based on the foregoing, the market for Lakeland common stock promptly digested current information regarding Lakeland from all publicly available sources and reflected such information in the prices of the common units, and Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

155. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## VIII. COUNTS

### COUNT I
### Violations of Section 10(b) And Rule 10b-5(b) Promulgated Thereunder Against Defendants Lakeland, Jenkins, and Shannon

156. Plaintiffs repeat and realleges each and every allegation contained above as if fully set forth herein.

157. Plaintiffs assert this claim against Defendants basing the claim upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

158. For the false statements alleged, the maker of the false statements is Defendant Lakeland and/or Defendants Jenkins or Shannon, and the Individual Defendants' scienter is imputed to Lakeland.

159. During the Class Period, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b), Defendant Lakeland, by and through its officers, disseminated materially false and misleading statements, based upon information Defendants Jenkins, and Shannon, and other senior Lakeland officers and employees furnished knowingly or deliberately disregarding that the information contained misrepresentations, omitted material facts, and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

160. Defendants Jenkins, and Shannon, and through their knowledge or reckless disregard, Lakeland, acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Lakeland were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of Lakeland, their control over, and/or receipt and/or modification of Lakeland allegedly materially misleading statements, and/or their

associations with Lakeland which made them privy to confidential proprietary information concerning Lakeland, participated in the fraudulent scheme alleged herein.

161. As a result of the foregoing, the market price of Lakeland common stock was artificially inflated during the Class Period.

162. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the integrity of the market price of Lakeland common stock during the Class Period in purchasing Lakeland common stock at prices that were artificially inflated as a result of Defendants' false and misleading statements.

163. Had Plaintiffs and the other members of the Class been aware that the market price of Lakeland common stock had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Lakeland common stock at the artificially inflated prices that they did, or at all. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

164. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5(b) promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of Lakeland common stock during the Class Period.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act Against Defendants Jenkins, Shannon, Phillips, and An**

165. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

166. During the Class Period, the Individual Defendants participated in the operation and management of Lakeland, and conducted and participated, directly and indirectly, in the conduct of Lakeland business affairs. Because of their senior positions, they knew the adverse non-public information about Lakeland's misstatement of revenue and profit and false financial statements.

167. As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Lakeland financial condition and results of operations, and to correct promptly any public statements issued by Lakeland which had become materially false or misleading.

168. Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Lakeland disseminated in the marketplace during the Class Period concerning Lakeland results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Lakeland to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Lakeland within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Lakeland common stock.

169. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Lakeland.

## IX. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a) declaring this action to be a proper class action, certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiffs' counsel as Lead Counsel;

(b) awarding damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c) awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## X. JURY TRIAL DEMANDED

170. Plaintiffs hereby demand a trial by jury.

Dated: July 24, 2026

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

*/s/ Jacob A. Goldberg*
Jacob A. Goldberg
Gonen Haklay
101 Greenwood Avenue, Suite 520
Jenkintown, PA 19046
Telephone: (215) 600-2817
Fax: (212) 202-3827
Email: jgoldberg@rosenlegal.com
Email: ghaklay@rosenlegal.com

Phillip Kim
Laurence M. Rosen
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Lead Counsel for Plaintiff and the Class*